2010 ME 24

**Edward DAMON**

v.

**S.D. WARREN CO. et al.**

Supreme Judicial Court of Maine.

Argued: Nov. 9, 2009.
Decided: March 23, 2010.

Thomas E. Getchell, Esq. (orally), Troubh Heisler, Portland, ME, for S.D. Warren Company and CCMSI.

James J. MacAdam, Esq. (orally), Nathan A. Jury, Esq., David E. Hirtle, Esq., MacAdam Law Offices, P.A., Portland, ME, for Edward Damon.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

SAUFLEY, C.J.

[¶ 1] During a downsizing period at S.D. Warren Co., Edward Damon accepted early retirement after a long period of employment. He immediately accepted full-time work with another employer. Three years later, Damon filed petitions for determination of permanent impairment, for payment of medical and related services, and for restoration, seeking partial workers' compensation benefits from S.D. Warren for a 1991 carpal tunnel injury. The Workers' Compensation Board hearing officer (*Collier, HO* ) granted Damon's petition for restoration, awarded ongoing partial incapacity benefits for the 1991 work injury, and, pursuant to 39 M.R.S.A. § 62–B (1989),[1] applied the offset for Damon's retirement benefits and for the retiree health and life insurance premiums, which S.D. Warren pays on Damon's behalf.

[¶ 2] S.D. Warren appeals, contending that the hearing officer erred when he failed to apply the retiree presumption of ineligibility for benefits pursuant to 39–A M.R.S. § 223 (2009).[2] Damon also appeals, contending that the hearing officer erred when, pursuant to 39 M.R.S.A. § 62–B, he offset Damon's workers' compensation benefits by the amounts that S.D. Warren now pays, through its retirement plan, for his retiree health and life insurance benefits. We affirm the decision regarding the retiree presumption, and we

vacate the decision regarding the offset of Damon's benefits.

## I.  FACTUAL BACKGROUND

[¶ 3]  The hearing officer found the following facts. Edward Damon worked at S.D. Warren for thirty-six years, mainly as a rigger and millwright. His work involved frequent heavy lifting, pushing and pulling, and using heavy tools and equipment. He developed bilateral carpal tunnel syndrome in 1991 and underwent release surgery on both wrists in 1992. Damon was released to work at full duty in 1993, but his symptoms gradually returned. He was diagnosed in 2000 with chronic work-related tendonitis as well as persistent carpal tunnel syndrome and was restricted from high impact and heavy work. Damon worked beyond these restrictions because of his strong work ethic and a fear of being laid off pursuant to a workplace policy.

[¶ 4]  In 2003, during a period of downsizing at S.D. Warren, Damon learned that he was facing an imminent layoff. S.D. Warren gave Damon the option of accepting a severance package that included voluntary early retirement with greater pay and benefits, or a less generous involuntary severance package that included recall rights to go back to work if jobs became available. Damon chose the early

---

1.  Title 39 M.R.S.A. § 62–B (1989) has been repealed and replaced by P.L. 1991, ch. 885, §§ A–7, A–8 (effective Jan. 1, 1993) (codified at 39–A M.R.S. § 221 (2009)). Section 62–B, nevertheless, governs the 1991 injury. For injuries incurred before January 1, 1993, the provisions of the current Act apply, except that the applicable provisions of former title 39 apply in place of 39–A M.R.S. §§ 211, 212, 213, 214, 215, 221 (the coordination of benefits provision), 306 and 325. P.L. 1991, ch. 885, § A–10.

2.  S.D. Warren also contends that the hearing officer erred by considering Damon's petition for determination of permanent impairment because it is moot; by determining that a permanent impairment evaluation for the purpose of litigation constitutes a compensable medical expense; and by finding that Damon's claim for medical expenses was not barred by the six-year statute of repose, 39 M.R.S.A. § 95 (Supp.1991). After giving full consideration to these issues, we are unpersuaded by S.D. Warren's arguments, and we do not discuss them further.

retirement option and retired effective February 1, 2004.

[¶ 5] Pursuant to his retirement package, Damon was paid pension benefits of $441.04 per week until he began to receive Social Security retirement benefits at age sixty-two, when his pension was reduced to $139.65 per week. He also receives two other benefits from S.D. Warren: (1) it pays 80% of the retiree health insurance premium ($217.79 per week in 2008); and (2) it pays 100% of his life insurance premium ($3.62 per week in 2008). Damon reached 62 years of age in 2007 and began receiving Social Security benefits in April of 2008. His Social Security benefit is $336 per week.

[¶ 6] Anticipating his departure from the mill, Damon began looking for work while he was still employed by S.D. Warren. He found a job as a custodian with the Scarborough School Department, and even before he left the mill, he began working there on weekends and after his shifts. After retiring from S.D. Warren, Damon immediately transitioned to full-time work as a custodian, and he continues to work full-time at that job. He also continues to experience the effects of his work injury, including numbness, tingling, and weakness in both hands, which worsen with gripping and vibration. The hearing officer determined that, if the downsizing had not occurred, Damon would not likely have been able to continue to perform his job at S.D. Warren indefinitely. He also explicitly found that, as a custodian, Da-

mon is now working at his full, post-injury earning capacity.

[¶ 7] On April 12, 2007, Damon filed petitions for restoration, for determination of permanent impairment, and for payment of medical and related services. S.D. Warren asserted that because Damon had terminated active employment and was receiving a pension, he was presumed to have no loss of earnings as a result of the work injury pursuant to the retiree presumption of 39–A M.R.S. § 223. The hearing officer rejected this argument and granted Damon's petition for restoration, awarding him ongoing partial incapacity benefits pursuant to 39–A M.R.S.A. § 55–B (Supp.1991).[3]

[¶ 8] For purposes of calculating the incapacity benefits, the hearing officer based Damon's current earning capacity on his 2007 average weekly wage of $529.84. The parties stipulated that Damon's average weekly wage at S.D. Warren was $970.10 per week.[4] Thus, pursuant to section 55–B, the hearing officer ordered the calculation of Damon's partial incapacity benefit based on a percentage of the difference between his pre-injury average weekly wage of $970.10 and his post-injury weekly earning capacity of $529.84, with an offset for his employer-paid retiree health and life insurance premiums pursuant to 39 M.R.S.A. § 62–B.[5]

[¶ 9] Damon filed a motion for additional findings of fact and conclusions of law. The hearing officer responded with minor changes to the findings of fact, leaving the decision substantially unchanged.

**3.** *See* P.L. 1991, ch. 885, § A–10.

**4.** The parties also stipulated that the weekly value of Damon's employer-provided fringe benefits was $263.02. The hearing officer, however, apparently used only the pre-injury wage, without including the value of the fringe benefits, in ordering the calculation of Damon's partial incapacity benefits.

**5.** The hearing officer also offset Damon's incapacity benefits by the statutorily authorized amount of the pension and Social Security benefits that he receives. The parties do not dispute these offsets.

Both parties filed petitions for appellate review, which we granted pursuant to 39–A M.R.S. § 322(3) (2009) and M.R.App. P. 23(c).

## II. DISCUSSION

■ [¶ 10] We address herein the treatment of the retiree presumption and the offset of the health and life insurance costs. We accept the hearing officer's findings of fact, 39–A M.R.S. § 318 (2009) ("The hearing officer's decision, in the absence of fraud, on all questions of fact is final.") and, where statutory construction is at issue, we construe a statute to give effect to legislative intent, *Nichols v. S.D. Warren/Sappi*, 2007 ME 103, ¶ 8, 928 A.2d 732, 734. This requires first looking at the plain meaning of the statutory language. *Id.* If the statutory language is ambiguous, we then look beyond the plain meaning and consider other indicia of legislative intent, including legislative history. *Id* Statutory language is ambiguous if it is reasonably susceptible of different interpretations. *Dep't of Corrs. v. Pub. Utils. Comm'n*, 2009 ME 40, ¶ 8, 968 A.2d 1047, 1050. Whether statutory language is ambiguous is a question of law. *See id.*

### A. The Retiree Presumption

[¶ 11] We first examine whether the retiree presumption in 39–A M.R.S. § 223 applies to Damon. Pursuant to section 223, an employee is presumed not to be eligible for workers' compensation benefits when two conditions are met. The employee must (1) "terminate[ ] active employment," and (2) "receiv[e] nondisability pension or retirement benefits under either a private or governmental pension or retirement program ... that was paid by or on behalf of an employer from whom weekly benefits under [the Workers' Compensation Act] are sought." 39–A M.R.S. § 223(1). The parties do not dispute that

the second condition is satisfied here. The issue is whether Damon "terminate[d] active employment."

■ [¶ 12] The hearing officer found that Damon did not terminate active employment. That finding involves a mixed question of fact and law. The factual findings—that Damon did leave full-time employment with the mill and take retirement benefits but also moved directly to full-time employment at the School Department, and that the full-time employment at the School Department represents Damon's current earning capacity—are fully supported on this record, and we do not disturb them. *See* 39–A M.R.S. § 318.

[¶ 13] S.D. Warren contends, however, that the hearing officer erred as a matter of law because the factual finding that Damon ceased employment with S.D. Warren, the company that is responsible for Damon's retirement benefits, necessarily triggers the conclusion that Damon "terminated active employment." In essence, S.D. Warren contends that an employee always "terminates active employment" when the employee retires from a job that the employee was actively performing and from which the employee receives retirement benefits, *see Bowie v. Delta Airlines, Inc.*, 661 A.2d 1128, 1131 (Me.1995), regardless of whether the employee terminates *all* active employment. We are thus presented with the question that we expressly left open in *Pendexter v. Tilcon of Maine, Inc.*: whether the retiree presumption of section 223 applies to an employee who retires from one employment and immediately commences new employment. *See* 1999 ME 34, ¶ 10, 724 A.2d 618, 621.

[¶ 14] A plain reading of the statute does not support S.D. Warren's contention. In setting forth the first condition of the presumption, section 223 unambiguously provides a presumption against "[a]n em-

ployee who terminates active employment," without any qualifying language that ties "active employment" to a specific employer. *See* 39–A M.R.S. § 223(1). By contrast, section 223 limits the second condition to pension or retirement benefits that are "paid by or on behalf of an employer from whom weekly benefits under this Act are sought." *See id.* If the Legislature had intended for the presumption to apply in every instance where the employee terminates active employment from the employer *from whom workers' compensation benefits are sought*, it could have included specific language to that effect. Instead, the Legislature provided that the presumption applies to "an employee who terminates active employment." Thus, when deciding whether an employee terminates active employment, the hearing officer is not restricted by law to considering only the employee's actions with regard to the employer from whom workers' compensation benefits are sought.

[¶ 15] Here, we accept the hearing officer's factual finding that, upon retirement from S.D. Warren, Damon immediately transitioned to full-time employment as a custodian at his full, post-injury earning capacity, "continu[ing] to work steadily without a break in employment." Based on the plain language of section 223, we conclude that the hearing officer did not err as a matter of law in determining that Damon, who prepared for his departure from S.D. Warren by seeking another full-time job at his highest earning capacity, did not "terminate active employment" for purposes of triggering the retirement presumption.

## B. Coordination of Benefits

[¶ 16] The offset provisions of 39 M.R.S.A. § 62–B(3) prevent S.D. Warren from having to pay Damon, through a combination of workers' compensation and retirement benefits, more in retirement than he would have earned had he remained employed there. There is no question, then, that S.D. Warren is entitled to offset from any workers' compensation award the statutorily authorized portion of the amount that Damon is receiving in weekly retirement benefits. *See* 39 M.R.S.A. § 62–B(3)(A). At issue here is the hearing officer's additional determination that S.D. Warren could reduce Damon's incapacity benefits by the amounts that it pays toward Damon's retiree health and life insurance. The hearing officer reached that decision based on his conclusion that the premiums "are payments that Mr. Damon's employer is obligated to make on his behalf pursuant to his retirement plan from this employer, and he receives the benefit of these payments." *See* 39 M.R.S.A. § 62–B(3).

[¶ 17] Section 62–B authorizes a reduction of the employer's obligation to pay an employee's incapacity benefits by:

(2) [t]he after tax amount of the payments received or being received under an *employee benefit plan provided by the same employer by whom benefits . . . are payable* if the employee did not contribute directly to the plan; and

(3) [t]he proportional amount, based upon the ratio of the employer's contributions to the total contributions, of the after tax amount of the payments received or being received by the employee under an *employee benefit plan provided by the same employer by whom benefits . . . are payable* if the employee did contribute directly to the plan.

39 M.R.S.A. § 62–B(3)(A)(2), (3) (emphasis added). "Employee benefit plan" is defined as "a self-insurance disability plan, wage continuation plan, disability insurance plan and a *pension or retirement plan* which is funded or paid for by the

employer in whole or in part." 39 M.R.S.A. § 62–B(2)(B) (emphasis added).

■ [¶ 18] Damon contends that the hearing officer erred in allowing the offset because section 62–B(3) is intended to prevent double recovery of wages, and life and health insurance premiums are not wages, nor are they intended to replace wages. S.D. Warren contends that the life and health insurance payments are part of the negotiated package of benefits that constitute S.D. Warren's retirement plan and as such, they are specifically enumerated by section 62–B to be offset.

[¶ 19] Damon correctly argues that life and health insurance benefits are not in the nature of wage replacement or disability insurance. *See Nichols,* 2007 ME 103, ¶¶ 11–13, 928 A.2d at 735–36. The question presented here, however, is whether health and life insurance premium payments made by an employer pursuant to a retirement plan constitute payments "received ... under an employee benefit plan," which may be coordinated with workers' compensation benefits pursuant to section 62–B(3). 39 M.R.S.A. § 62–B(3)(A)(2), (3).

[¶ 20] By its plain meaning, the phrase "retirement plan," as it is used to define "employee benefit plan" in section 62–B(2)(B), could be interpreted broadly, as S.D. Warren argues, to mean a plan that provides any benefits to employees upon retirement. The phrase could also be interpreted in the entire context of the statutory definition—"a self-insurance disability plan, wage continuation plan, disability

insurance plan and a pension or retirement plan"—to be limited to retiree benefits that are in the nature of wage replacement.[6] *See* 39 M.R.S.A. § 62–B(2)(B). Thus, the term "retirement plan," as used in section 62–B(2)(B), is ambiguous, and we look beyond the statute's plain meaning to discern the Legislature's intent. *See Nichols,* 2007 ME 103, ¶ 8, 928 A.2d at 734.

[¶ 21] The legislative history of section 62–B indicates that " '[t]he purpose of coordination of benefits is to preclude anyone from receiving a greater *income* because of the receipt of Social Security or retirement benefits along with workers' compensation than they would have received had they continued to work.' " *Temm v. S.D. Warren Co.,* 2005 ME 118, ¶ 12, 887 A.2d 39, 43 (emphasis added) (quoting Sen. Amend. B to L.D. 1634, No. S–217, Statement of Fact (112th Legis. 1985)). A primary purpose of benefit coordination is to avoid double recoveries and the stacking of benefits. *See, e.g., id.; Jordan v. Sears, Roebuck & Co.,* 651 A.2d 358, 360–61 (Me.1994); *Berry v. H.R. Beal & Sons,* 649 A.2d 1101, 1103 (Me.1994).

[¶ 22] It could be consistent with this legislative purpose for an employer to offset some portion of its payments for an employee's retiree health and life insurance premiums from the employee's incapacity benefits if employer-paid fringe benefits were already factored into the incapacity benefits for which that employer is responsible. *See* 39–A M.R.S. § 102(4)(H) (2009).[7] However, to allow an

---

6. "Retirement plan" is defined as "[a]n employee benefit plan—such as a pension plan or Keogh plan—provided by an employer ... for an employee's retirement." Black's Law Dictionary 603 (9th ed.2009). "Employee benefit plan" is defined as "[a] written stock-purchase, savings, option, bonus, stock-appreciation, profit-sharing, thrift, incentive, pension, or similar plan solely for employees,

officers, and advisers of the company...." *Id.* at 602.

7. Title 39–A M.R.S. § 102(4)(H) (2009) directs that fringe benefits be included in the average weekly wage only to a limited extent. It provides:

   "Average weekly wages, earnings or salary" does not include any fringe or other

employer to offset retiree life and health insurance payments when fringe benefits were not considered when calculating the employee's incapacity benefits would not prevent a double recovery or stacking of benefits. Such an offset would expand the scope of the coordination of benefits statute beyond what the Legislature intended. *See Jordan,* 651 A.2d at 362.

[¶ 23] Here, for purposes of calculating Damon's incapacity benefits, the hearing officer did not include the value of the life and health insurance fringe benefits that S.D. Warren paid while it employed Damon as part of his pre-injury average weekly wage.[8] Consequently, reducing Damon's weekly incapacity benefits by S.D. Warren's proportional share of his retiree health and life insurance premiums would not serve the legislative purpose to avoid a double recovery or stacking of benefits. Had the Legislature intended to allow an offset for insurance payments made by the employer or the employer's

retirement plan on behalf of the employee in the absence of such "double recovery" calculation, it would likely have said so much more clearly.

[¶ 24] We therefore conclude that, based on the stated legislative purpose of section 62–B, the term "retirement plan," as used in section 62–B(2)(B), does not encompass payments, not made directly to the employee, for premiums of retiree health or life insurance benefits when payments for similar fringe benefits are not included in average weekly wages for the calculation of incapacity benefits.[9] Accordingly, the hearing officer erred as a matter of law in determining that S.D. Warren's payments for Damon's retiree health and life insurance benefits are subject to coordination of benefits pursuant to section 62–B(3). We must, therefore, vacate the decision of the hearing officer on this issue and remand for further calculations.

The entry is:

---

benefits paid by the employer that continue during the disability. Any fringe or other benefit paid by the employer that does not continue during the disability must be included for purposes of determining an employee's average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount that is greater than 2/3 of the state average weekly wage at the time of injury. The limitation on including discontinued fringe or other benefits only to the extent that such inclusion does not result in a weekly benefit amount greater than 2/3 of the state average weekly wage at the time of injury does not apply if the injury results in the employee's death.

8. There is apparent disagreement among the parties, as characterized in the respective appellate briefs, as to whether fringe benefits were included in the employee's average weekly wage. However, it appears to us from the hearing officer's decision that fringe benefits were not considered in that calculation. The hearing officer noted that the parties stipulated that "the employee's base pre-injury

average weekly wage was $970.10 and the weekly value of his employer-provided fringe benefits as of 1995 was $263.02." In concluding, however, the hearing officer stated that the employee is entitled to partial incapacity benefits "based on the difference between his pre-injury average weekly wage of $970.10 and his post-injury weekly earning capacity of $529.84 with offsets." To the extent that the inclusion of fringe benefits in the average weekly wage calculation remains disputed, the parties may seek a clarification from the hearing officer on remand.

9. Should a hearing officer find it appropriate to allow an offset for retiree life and health insurance benefits, it will be incumbent on that hearing officer to consider the extent to which similar fringe benefits were included in pre-injury average weekly wage pursuant to section 102(4)(H), and to limit any offset to the extent that retiree life and health insurance premium payments represent a double recovery for the employee.

The Workers' Compensation Board hearing officer's decision is vacated regarding the offset of retiree health and life insurance benefits and affirmed in all other respects. Remanded for further proceedings consistent with this opinion.