2012 ME 135

**Jamie FUHRMANN**

v.

**STAPLES the OFFICE SUPERSTORE EAST, INC. et al.**

Supreme Judicial Court of Maine.

Argued: June 13, 2012.

Decided: Dec. 11, 2012.

---

John P. Gause, Esq. (orally), Maine Human Rights Commission, for amicus curiae Maine Human Rights Commission.

James R. Erwin, Esq., Ella L. Brown, Esq., and Katharine I. Rand, Esq., Pierce Atwood LLP, Portland, for amici curiae Maine State Chamber of Commerce, Portland Regional Chamber of Commerce, National Federation of Independent Businesses, Associated Builders and Contractors of Maine, Maine Innkeepers Association, Maine Restaurant Association, Maine Motor Transport Association, Maine Merchants Association, and Maine Grocers' Association.

Curtis Webber, Esq., Linnell, Choate & Webber, LLP, and Richard L. O'Meara, Esq., Murray, Plumb & Murray, Portland, on the briefs, for amicus curiae Maine Employment Lawyers Association.

William J. Schneider, Attorney General, Kelly L. Turner, Asst. Atty. Gen., and Susan P. Herman, Asst. Atty. Gen., Augusta, on the briefs, for amicus curiae State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: SAUFLEY, C.J., and ALEXANDER, SILVER, and JABAR, JJ.

Dissent/Concurrence: LEVY, MEAD, and GORMAN, JJ.

SILVER, J.

Tina Heather Nadeau, Esq. (orally), Daniel G. Lilley Law Offices, P.A., Portland, for appellant Jamie Fuhrmann.

Ariel D. Cudkowicz, Esq., and Anthony S. Califano, Esq. (orally), Seyfarth Shaw LLP, Boston, Massachusetts, and Peter Bennett, Esq., The Bennett Law Firm, P.A., Portland, for appellees Staples, Inc., and Staples The Office Superstore East, Inc.

[¶ 1] Jamie Fuhrmann appeals from the entry of a summary judgment in favor of Staples the Office Superstore East, Inc., by the Superior Court (York County, *Fritzsche, J.*) and the court's dismissal of her claims against four individual supervisors, Christian Steppe, John LeMieux, Matthew Auger, and Annette Rodick, for whistleblower discrimination pursuant to the Whistleblowers' Protection Act (WPA),

26 M.R.S. § 833(1)(A) (2011), and the Maine Human Rights Act (MHRA), 5 M.R.S. § 4572(1)(A) (2011). Fuhrmann contends that a summary judgment for Staples was improper because she presented a prima facie case of whistleblower discrimination and there remain material facts in dispute. She also argues that the court erred by dismissing her claims against her workplace supervisors based on its determination that they could not be held individually liable pursuant to the WPA and the MHRA. We agree with Fuhrmann that material facts remain in dispute regarding her whistleblower claim but conclude that the WPA and the MHRA do not provide for individual supervisor liability.[1] We therefore vacate the judgment in part and remand for further proceedings.

## I. FACTUAL BACKGROUND

[¶ 2] Jamie Fuhrmann began working for Staples at its South Portland store in December 1999. While working there, she gave birth to her first child in 2000 and her second child a few years later, as a single mother. Fuhrmann worked a set schedule of Monday through Friday from 8 a.m. to 4:30 p.m. in the South Portland store and worked additional hours when childcare was available. In 2006, she requested a transfer from the South Portland store to Staples's Biddeford store in order to be closer to her children's new daycare. Fuhrmann met with Biddeford general manager Christian Steppe prior to transferring and requested that she be allowed to keep her set weekday hours. Steppe was able to accommodate that schedule and Fuhrmann began working as a full-time furniture associate in Biddeford in 2006.

[¶ 3] At some point after Fuhrmann began at the Biddeford store, the store moved to a new location in a retail plaza. Because of the move, the store lost some small-business sales during daytime hours, and sales began to peak in the evenings. Staples used a computerized system to evaluate sales data and employee scheduling efficiency, and it had customer reports showing that customer satisfaction was low in the evening hours. Staples asserts that this data demonstrated that the furniture department needed more coverage in the evenings and on weekends, but Fuhrmann asserts that the data was not department-specific and showed only that the store as a whole needed more support in that timeframe.

[¶ 4] Between September and October 2007, Fuhrmann made three internal reports about incidents in the Biddeford store. The first two reports involved company policy violations that were investigated by senior loss prevention manager Matthew Auger and resulted in disciplinary actions against Steppe and operations manager John LeMieux. Fuhrmann made her third report in October 2007, reporting to Auger that certain merchandise items that she was preparing for sale at Steppe's direction—including furniture—had been coded in the store's inventory system as charitable donations. Staples has a program through which it codes and sets aside merchandise to be donated, and for which it takes a deduction on its corporate tax return. Company policy requires merchandise coded for donation to be immediately set apart from saleable merchandise. Fuhrmann believed that the coding discrepancy she discovered violated tax laws because it constituted "double dipping" by

---

1. Fuhrmann no longer argues that the court erred in entering summary judgment against her on her sex discrimination claim. Accordingly, we affirm that portion of the Superior Court's judgment.

the company. Staples disputes that Fuhrmann held such a belief.

[¶ 5] Fuhrmann reported the coding discrepancy to Auger both in person and by email, and he conducted an investigation. Auger found that some furniture items coded for donation had already been sold and that other items coded for donation remained in the store's inventory instead of having been set aside. Because a store-specific manager's passcode had been used to code the items, Auger decided to interview the Biddeford store's managers about the miscoding, including Steppe and LeMieux, and he notified Staples's district manager, Annette Rodick, about the investigation.

[¶ 6] Auger interviewed the managers on November 19, 2007, and they all denied responsibility. The parties dispute whether Steppe, LeMieux, and Rodick knew that Fuhrmann had made the report. Auger did not disclose Fuhrmann's identity and Staples asserts that the managers did not know that Fuhrmann had made the report until she commenced this litigation. Fuhrmann asserts that they must have known that she made the report because she was the only full-time furniture associate and Steppe had instructed her to prepare the miscoded furniture items for sale. Because Auger and Rodick were unable to determine who was actually responsible for the miscoding, Steppe was held responsible as the general manager of the store.

[¶ 7] Also in November, Fuhrmann met with Steppe and LeMieux to discuss her work schedule. Steppe told her that she would no longer be able to work her set weekday daytime schedule and would have to make herself available to work nights and weekends. The parties dispute when this meeting occurred. Staples asserts that it took place on or around November 5, 2007, as stated by Fuhrmann in her subsequent complaints to the Maine Human Rights Commission (Commission) and the Superior Court, but Fuhrmann now asserts that the meeting occurred on or around November 28, 2007, which was acknowledged as a possibility by Steppe and LeMieux in their depositions.

[¶ 8] Fuhrmann told Steppe that she could not switch from her set daytime schedule because of her children's daycare hours. Although Staples disputes these facts, Fuhrmann asserts that Steppe denied her request to switch to part-time status and told her that she had one week to rearrange her schedule. Staples asserts that Steppe and LeMieux asked other full-time employees to increase their schedule flexibility around the same time. Fuhrmann asserts that she was not aware of anyone else being asked to shift his or her schedule, but she did not speak with other full-time employees at the time.

[¶ 9] Fuhrmann subsequently spoke with a human resources representative and was told that she could have one month to determine if she could work a non-set schedule that would include evenings and weekends. Based on her childcare needs, Fuhrmann felt forced to resign by the request and gave her two-weeks' notice on December 28, 2007. She worked her regular schedule until her last day at the store on January 11, 2008.

## II. PROCEDURAL BACKGROUND

[¶ 10] Fuhrmann filed a complaint with the Commission in April 2008 and was authorized to sue Staples and her four individual supervisors—Auger, LeMieux, Rodick, and Steppe. She filed this action against all five defendants in October 2009. The complaint included claims for whistleblower retaliation as prohibited by both the WPA and the MHRA, sex discrimination pursuant to the MHRA, and punitive damages. The complaint alleged that Sta-

ples and Fuhrmann's four supervisors had unlawfully discriminated against her based both on her status as a woman with children and in retaliation for reporting what she believed to be illegal conduct. All five defendants filed motions to dismiss, which the court granted as to the individual supervisors—concluding that neither the WPA nor the MHRA provides for individual liability—but denied as to Staples. Staples then removed the case to the United States District Court, but it was subsequently remanded to the Superior Court.

[¶ 11] Next, Staples moved for summary judgment. With respect to the claim addressed here, Fuhrmann's whistleblower retaliation claim, the court concluded that the evidence showed that there was no causal link between her internal report about the miscoding of items for donation and the request that she change her work schedule. Summary judgment was awarded to Staples on all counts.

## III. DISCUSSION

[¶ 12] Fuhrmann appeals from both the court's grant of summary judgment in favor of Staples and its prior dismissal of the four individual supervisors on her whistleblower claim. We must determine whether the summary judgment awarded Staples was proper and whether the court properly dismissed the claim against Fuhrmann's supervisors on the basis that there is no individual supervisor liability in connection with claims of employment discrimination pursuant to the WPA and the MHRA.

### A. Summary Judgment for Staples

[¶ 13] "We review a grant of summary judgment de novo, viewing the facts and any inferences that may be drawn from them in the light most favorable to the nonprevailing party to determine" if there are genuine issues of material fact. *Cookson v. Brewer Sch. Dep't,* 2009 ME 57, ¶ 11, 974 A.2d 276. When evaluating employment discrimination claims at the summary judgment stage, we apply a three-step, burden-shifting analysis to determine whether (1) the employee has presented prima facie evidence of discrimination; (2) the employer has presented prima facie evidence of a legitimate, non-discriminatory reason for the adverse action; and, in response, (3) the employee has presented prima facie evidence that the employer's proffered reason is pretextual or untrue. *See Daniels v. Narraguagus Bay Health Care Facility,* 2012 ME 80, ¶¶ 14–15, 45 A.3d 722. *But see id.* ¶¶ 29–36 (Silver, J., concurring) (opining that application of three-step, burden-shifting analysis to discrimination claims is inappropriate at summary judgment stage). This analysis addresses the parties' burdens of production, not persuasion. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 521, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "We are mindful that discrimination claims in general are often difficult to assess at the summary judgment stage, and particularly that the issue of whether an employee has generated an issue of fact regarding an employer's motivation or intent is one heavily dependent on the individual facts before the court." *Daniels,* 2012 ME 80, ¶ 15, 45 A.3d 722 (quotation marks omitted).

[¶ 14] The WPA protects employees who in good faith report a possible violation of the law:

1. **Discrimination prohibited.** No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

A. The employee, acting in good faith ... reports orally or in writing to the employer ... what the employ-

ee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States. . . .

26 M.R.S. § 833(1)(A). Because the WPA "does not itself provide a judicial remedy," there is no direct cause of action pursuant to the WPA. *Me. Human Rights Comm'n v. Me. Dep't of Def. & Veterans' Servs.*, 627 A.2d 1005, 1007 n. 8 (Me.1993).[2] However, the MHRA provides a direct cause of action for employees alleging discrimination based on WPA-protected whistleblowing activity:

> 1. **Unlawful employment.** It is unlawful employment discrimination . . .
>
> A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment . . . because of previous actions taken by the applicant that are protected under [the WPA,] Title 26, chapter 7, subchapter 5–B; or, because of those reasons, to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment. . . .

5 M.R.S. § 4572(1)(A). Count II of Fuhrmann's complaint states a claim for whistleblower discrimination under the MHRA, alleging retaliation for actions that are "protected under the Whistleblowers Protection Act," and we therefore evaluate her whistleblower claim within the framework of the MHRA.

[¶ 15] To prevail on an MHRA claim for whistleblower discrimination, Fuhrmann must show that she engaged in activity protected by the WPA, she experienced an adverse employment action, and a causal connection exists between the protected activity and the adverse action. *See Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 12, 915 A.2d 400.[3] Viewing the record in the light most favorable to Fuhrmann and drawing all reasonable inferences in her favor, *see Cookson*, 2009 ME 57, ¶ 11, 974 A.2d 276, we conclude that Fuhrmann has established a genuine issue of material fact as to each element of her prima facie case.

 [¶ 16] With respect to protected activity, the record could support a finding that Fuhrmann reasonably believed that some sort of fraud or illegality had occurred with respect to the furniture miscoded for donation. *See* 26 M.R.S. § 833(1)(A) (requiring reasonable cause); *Stewart–Dore v. Webber Hosp. Ass'n*, 2011 ME 26, ¶ 11, 13 A.3d 773 (stating reasonable cause requirement met if employee "had a subjective belief that a dangerous condition or practice existed, and that the belief was objectively reasonable"). As to

---

2. In 1988, the Maine Legislature amended the WPA by eliminating the private cause of action that the WPA had previously authorized. P.L.1987, ch. 782, § 5 (effective Aug. 4, 1988) (repealing 26 M.R.S.A. § 834). The same legislation that eliminated that claim also amended the MHRA to make it unlawful for employers to discriminate based on actions protected by the WPA. P.L.1987, ch. 782, § 1 (effective Aug. 4, 1988) (codified as amended at 5 M.R.S. § 4572(1)(A)-(D) (2011)). The WPA does, however, permit individuals to bring complaints alleging WPA violations before the Commission pursuant to the procedures outlined in the MHRA. *See* 26 M.R.S.

§ 834–A (2011); *Me. Human Rights Comm'n v. Me. Dep't of Def. & Veterans' Servs.*, 627 A.2d 1005, 1007 n. 8 (Me.1993).

3. Although the court's decision focused only on the causation element in denying Fuhrmann's claim, because summary judgment requires a de novo review and Staples contests each element, we discuss each here. *See Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 16, 983 A.2d 382 (noting that we may affirm a summary judgment on alternative theories argued by the moving party).

the adverse action prong of her prima facie case, Fuhrmann presented evidence that she could not change her schedule as Steppe demanded because of her childcare needs, that Steppe was aware of her daycare schedule, that her request to work part-time was denied, and that she was therefore forced to resign her position. *See King v. Bangor Fed. Credit Union,* 611 A.2d 80, 82 (Me.1992) (explaining that constructive discharge exists "where, although not formally discharged by the employer, the employee has no reasonable alternative to resignation because of intolerable working conditions"); *see also* 5 M.R.S. § 4572(1)(A) (prohibiting, with respect to protected activity under the WPA, discrimination in the "terms, conditions or privileges of employment"). Finally, with respect to causation, Fuhrmann presented evidence that Steppe was aware that Fuhrmann was responsible for the report: he told her to prepare the miscoded furniture for sale and she was the only full-time furniture associate. *See Stanley v. Hancock Cnty. Comm'rs,* 2004 ME 157, ¶¶ 19–21, 864 A.2d 169 (recognizing that "self-serving" statements and circumstantial evidence can be used to establish or dispute a material fact). Fuhrmann also presented evidence that less than two months elapsed between her October report regarding the miscoded items and the November meeting when she was told that she would have to change to a non-set schedule. *See Daniels,* 2012 ME 80, ¶ 21, 45 A.3d 722 ("Temporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case.").[4]

■ [¶ 17] Staples, in turn, satisfied its burden of presenting evidence of a legitimate business reason for its adverse employment action. Specifically, Staples presented the following evidence that Fuhrmann's schedule change was necessary: there was a shift in peak sales hours after the Biddeford store changed locations; customer satisfaction reports showed the need for more sales coverage later in the day, after the hours that Fuhrmann worked; the Biddeford store received poor schedule effectiveness ratings according to a computer program the company uses to evaluate sales data and

4. Staples disputes the sequence of events and asserts that these facts are not sufficiently disputed by Fuhrmann. Staples contends that the earliest the managers knew about Fuhrmann's report was November 19, 2007, when they were interviewed by Auger about the items miscoded as donations. Staples points to the date of the schedule-change meeting alleged in Fuhrmann's complaint to the Commission and in her complaint to the Superior Court—November 5, 2007—to establish when the schedule-change meeting took place, and it argues that Fuhrmann cannot contradict her prior sworn statement in the Commission complaint by asserting a different date—November 28—at the summary judgment stage. *See Blue Star Corp. v. CKF Props., LLC,* 2009 ME 101, ¶ 31, 980 A.2d 1270 ("[A] party will not be permitted to create an issue of material fact in order to defeat a summary judgment motion simply by submitting an affidavit disputing his own prior sworn testimony." (quotation marks omitted)). However, Staples did not include Fuhrmann's Commission complaint in the summary judgment record and it cannot be used to support Staples's statement of material facts. *See* M.R. Civ. P. 56(h)(4); *Levine v. R.B.K. Caly Corp.,* 2001 ME 77, ¶ 6, 770 A.2d 653 (stating that motions for summary judgment must include copies of the record references made in the statement of facts). Although Fuhrmann's Superior Court complaint states that the meeting took place on November 5, the complaint is not sworn testimony by Fuhrmann, and regardless, she has cited to and presented admissible evidence—Steppe's and LeMieux's deposition testimony—to support her assertion that the meeting occurred around November 28. This evidence is sufficient to create a dispute about the temporal sequence of the report and the adverse action.

employee scheduling efficiency; and sales data showed that the furniture department needed more coverage in the evenings. Staples also points to the fact that Fuhrmann was the only full-time employee who refused to work hours other than her set hours, and to testimony by district manager Rodick that "[i]t's not realistic to have set schedules in retail."

[¶ 18] Although Fuhrmann has not directly disputed Staples's assertion that there was a shift in peak sales hours or that customer satisfaction was low for the evening hours, she presented evidence that the sales data and customer reports were not department-specific and showed only information about the store as a whole. This calls into question Staples's assertion that it needed more coverage in the furniture department. Fuhrmann also presented evidence that during her eight years at Staples, she worked the same set schedule except for some number of evenings, weekends, and holidays when she had childcare available, disputing Staples's assertion that set schedules are not realistic in retail. Staples presented no evidence to show how often Fuhrmann worked other hours, failing to dispute the inference that it was minimal.

[¶ 19] Fuhrmann also presented evidence that at some point after one of her first two internal reports of company policy violations, Steppe asked another employee to disclose who had "ratted him out"; that Steppe was under pressure from Rodick to increase the store's performance; and that Steppe was disciplined in part because of the inconsistent management practices that were discovered as a result of Fuhrmann's reports. As discussed above, she also presented circumstantial evidence to support her assertion that Steppe knew that she had made the WPA-protected donation-coding report before she was told to change her schedule. Staples does not dispute Fuhrmann's claim that she felt that her job was "kind of unbearable" after she made the miscoding report because she was "working for managers that weren't being honest" and that she "felt like [she] was getting pushed out because of [her] set schedule." [5]

[¶ 20] Additionally, Fuhrmann points to evidence that Staples changed its explanation of the nondiscriminatory reasons for requiring the schedule change between when it first defended Fuhrmann's charge before the Commission and when the case reached the summary judgment stage. Staples's initial explanation was that it had to "reevaluate a number of staffing and scheduling issues" due to payroll cuts—specifically, that it was not feasible to allow Fuhrmann to begin work before the store opened, and her unavailability on school holidays created scheduling difficulties. However, as Fuhrmann has shown, her hours began at 8 a.m., coinciding with the opening of the store, and Staples's letter to the Commission did not mention the store move, the shift in peak sales

5. Staples presented additional evidence that Rodick told Steppe to ask all employees to open up their schedule availability to meet business needs; that Steppe told at least one other full-time employee, Rodney Beausang, that he could no longer work a set schedule; and that Steppe spoke with a third full-time employee, Tim Sawyer, the same day he spoke with Fuhrmann. However, as Staples admits, Fuhrmann does not know what Steppe actually discussed with Sawyer, and Staples does not offer any evidence to that effect. Neither does Staples present any evidence that either of these other two employees' schedules actually changed. The only evidence Staples presents to show that it implemented a schedule change for another employee is that the furniture associate hired to replace Fuhrmann worked evenings and weekends. However, as Staples admits, this new employee was hired in November 2008, almost a year after Fuhrmann left her job. Staples does not explain how its sales needs were met in the interim.

hours, or the customer satisfaction reports. Finally, Fuhrmann has raised an issue of fact as to whether Staples denied her request to work part-time.

[¶ 21] Considered together, the evidence indicating possible weaknesses and inconsistencies in Staples's stated reason for changing Fuhrmann's schedule is sufficient to generate an issue of disputed fact as to the legitimate business reason proffered by Staples. *See Stanley*, 2004 ME 157, ¶¶ 20–21, 864 A.2d 169 (stating that nonmoving party may generate factual dispute about pretext by denying moving party's assertions and supporting denials "with record citations to circumstantial evidence that the ... nondiscriminatory explanation was unworthy of credence"). Fuhrmann does not need to "convince the court on summary judgment that she *was* subjected to an adverse employment decision because of her protected [report], or even that her version of events is more plausible." *Cookson*, 2009 ME 57, ¶ 23, 974 A.2d 276. She need only present sufficient evidence to raise an issue of fact regarding whether her WPA-protected report "was a substantial, even though perhaps not the only, factor motivating [her] dismissal." *Walsh v. Town of Millinocket*, 2011 ME 99, ¶ 25, 28 A.3d 610 (quotation marks omitted). Fuhrmann has done so here, and we vacate the summary judgment with respect to her whistleblower claim.

B. Individual Supervisor Liability

[¶ 22] Fuhrmann argues that the court erred by concluding that her claims against her four individual supervisors—Auger, LeMieux, Rodick, and Steppe—should be dismissed on the basis that there is no individual supervisor liability under the MHRA for a claim of discrimination based on activity protected by the WPA. On appeal from an order granting a motion to dismiss a claim, we review the legal sufficiency of the complaint de novo. *See McCormick v. Crane*, 2012 ME 20, ¶ 5, 37 A.3d 295. We have not previously decided whether the MHRA and the WPA provide for individual liability of supervisory employees.[6] Fuhrmann, backed by the Commission and the Maine Employment Lawyers Association as amici curiae, urges us to construe those statutes as providing for individual liability. Staples and the individual defendants (collectively, Staples), supported by amici curiae State of Maine and Maine State Chamber of Commerce (and other business and trade organizations), argue that we should follow federal precedent and reject such a construction.

[¶ 23] We interpret the language of a statute de novo by first examining its plain meaning. *Kimball v. Land Use Regulation Comm'n*, 2000 ME 20, ¶ 18, 745 A.2d 387. "Only when we determine that a statute is ambiguous do we look beyond the plain language of the statute and the context of the whole statutory scheme to indicia of legislative intent such as the statute's history and its underlying policy." *HL 1, LLC v. Riverwalk, LLC*, 2011 ME 29, ¶ 17, 15 A.3d 725. "A statute is ambiguous if it is reasonably susceptible to different interpretations." *Estate of Joyce v. Commercial Welding Co.*, 2012 ME 62, ¶ 12, 55 A.3d 411. When a statute administered by an agency is ambiguous,

6. Although we addressed the question of individual liability in a withdrawn opinion in *Gordan v. Cummings*, No. Cum–99–254 (Me. Apr. 19, 2000), *withdrawn and replaced by* 2000 ME 68, 756 A.2d 942, where the majority concluded that the MHRA applied to individual supervisors, that opinion is not precedent and we do not rely on its reasoning here. Our published opinion in that case did not reach the question of individual supervisor liability. *See Gordan v. Cummings*, 2000 ME 68, ¶¶ 10–11, 756 A.2d 942.

we "review whether the agency's interpretation of the statute is reasonable and uphold its interpretation unless the statute plainly compels a contrary result." *Goodrich v. Me. Pub. Emps. Ret. Sys.*, 2012 ME 95, ¶ 6, 48 A.3d 212.

[¶ 24] We begin with the language of the statutes at issue. The MHRA provides that employment discrimination is committed by one who is an "employer." 5 M.R.S. § 4572(1)(A).[7] It defines "employer" to include "any person acting in the interest of any employer, directly or indirectly." 5 M.R.S. § 4553(4) (2011). The MHRA defines "person," in turn, as including "one or more individuals, partnerships, associations, organizations, corporations, municipal corporations, legal representatives, trustees, trustees in bankruptcy, receivers and other legal representatives, and includes the State and all agencies thereof." 5 M.R.S. § 4553(7) (2011).[8] Nowhere in this definition is the word "supervisor" used. *See id.* The WPA defines employer to include "an agent of an employer and the State." 26 M.R.S. § 832(2) (2011).

[¶ 25] Despite the difference in the statutes' definitions of "employer," they both identify the same person, because an agent of an employer is by definition a person who acts in the employer's interest. *See* Black's Law Dictionary 72 (9th ed.2009) (defining "agent" as "[o]ne who is authorized to act for or in place of another"); Restatement (Second) of Agency § 387 cmt. a (1958) ("An agent is one who

acts on behalf of the principal and only for his benefit."). For this reason, it is not necessary to parse out the semantic differences between the two definitions of "employer" in an effort to determine whether one statute permits individual supervisor liability while the other does not.

[¶ 26] Viewed in isolation, these definitions could reasonably be interpreted as identifying the agents of an employer as a distinct category of "employer" for purposes of the MHRA and WPA, and therefore imposing individual supervisor liability. On the other hand, as Staples argues, the statutes may also reasonably be construed as simply incorporating respondeat superior liability into the MHRA and WPA, in order to prevent employers from denying liability for actions taken by their employee-supervisors. Staples contends that permitting the definitions to impose individual liability eviscerates the vicarious liability they would otherwise create and that they cannot be read as simultaneously providing for both vicarious and individual liability. Because the statutory language at issue is reasonably susceptible of different meanings, we consider it ambiguous. We therefore look to other indicia of legislative intent.

[¶ 27] In support of their respective positions, the parties and amici cite federal cases interpreting similar language in Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e(b) (LexisNexis 2009); the Americans with Disabili-

---

7. Although the MHRA generally authorizes actions for discrimination against the "person or persons" who commit discrimination, 5 M.R.S. § 4621 (2011), the relevant portion of the employment discrimination section of the MHRA applies only to "employer[s]," 5 M.R.S. § 4572(1)(A) (2011). The WPA's anti-whistleblower discrimination provision, 26 M.R.S. § 833(1) (2011), similarly applies to "employer[s]." Title 5 M.R.S. § 4621 has since been amended by P.L.2011, ch. 613,

§ 22 (effective Sept. 1, 2012) (to be codified at 5 M.R.S. § 4621), but the change does not affect this appeal.

8. Title 5 M.R.S. § 4553(7) has since been amended by P.L.2011, ch. 613, § 7 (effective Sept. 1, 2012) (to be codified at 5 M.R.S. § 4553(7)), but the change does not affect this appeal.

ties Act of 1990 (ADA), 42 U.S.C.S. § 12111(5)(A) (LexisNexis 2009); the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C.S. § 630(b) (LexisNexis 2002); the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C.S. § 203(d) (Law. Coop.1993); and the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C.S. § 2611(4) (LexisNexis 2005). Looking to federal law illuminates a difference between the MHRA and WPA, because language tracking the MHRA definition of "employer" has been interpreted to allow individual supervisor liability, and language tracking the WPA definition of "employer" has been interpreted to preclude it. *See* Mitchell H. Rubinstein, *Employees, Employers, and Quasi–Employers: An Analysis of Employees and Employers Who Operate in the Borderland Between an Employer–and–Employee Relationship,* 14 U. Pa. J. Bus. L. 605, 653–55 (2012) (noting federal courts have overwhelmingly interpreted "agent" language in Title VII, the ADA, and the ADEA, as not providing for individual supervisor liability, but some have interpreted "any person" language in FLSA and FMLA to permit individual liability).[9] Relying on either strain of federal law to the exclusion of the other would ignore our long-standing instruction to read seemingly contradictory statutes in a way that leaves the efficacy of both intact and achieves a harmonious result. *See Adoption of Tobias D.,* 2012 ME 45, ¶ 15, 40 A.3d 990 (stating that statutes must be read together and in light of the entire statutory scheme to produce cohesive results). Moreover, while we have looked to federal law in the interpretation of the MHRA and WPA, *Currie,* 2007 ME 12, ¶ 13, 915 A.2d 400, we "must not abdicate [our] function of conclusively resolving matters of purely state law," *Jackson v. State,* 544 A.2d 291, 296 n. 7 (Me.1988) (quotation marks omitted); *see also Batchelder v. Realty Res. Hospitality, LLC,* 2007 ME 17, ¶¶ 20–22, 914 A.2d 1116 (recognizing MHRA modeled after federal anti-discrimination statutes but declining to construe it as adopting federal standard of proof for punitive damages claims). Federal law is, accordingly, not dispositive in this case.

[¶ 28] Legislative history is similarly unenlightening. In 2001, the Legislature considered L.D. 1599 (120th Legis.2001), which would have deleted the "any person" clause from the MHRA's definition of "employer," expressly rejected individual liability, and provided for the incorporation of common law principles of agency into the Act. *See* Katharine I. Rand, Comment, *Taking Care of Business and Protecting Maine's Employees: Supervisor Liability for Employment Discrimination under the Maine Human Rights Act,* 55 Me. L.Rev. 427, 457 (2003) (discussing L.D. 1599). This bill failed to pass. 2 Legis. Rec. H–1369 to –1371, S–1151 to –1152 (1st Reg.Sess.2001). Subsequently, in 2003, the Legislature considered L.D. 523 (121st Legis.2003), which would have expressly included individual liability in the MHRA.

---

**9.** Further complicating matters, Title VII, whose protections are most closely analogous to those of the MHRA, defines "employer" in terms more closely resembling the language of the WPA. *Compare* 42 U.S.C.S. § 2000e(b) (LexisNexis 2009), *with* 26 M.R.S. § 832(2) (2011). Moreover, one of the primary reasons cited by federal courts for excluding individual liability under Title VII is that the statute exempts businesses with fewer than fifteen employees and that it is "inconceiva-

ble" that Congress would have intended to include individual employees within the statute's scope. *Fantini v. Salem State College,* 557 F.3d 22, 28–31 (1st Cir.2009) (quoting *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587 (9th Cir.1993)); *see also* 42 U.S.C.S. § 2000e(b). By contrast, the MHRA applies to all employers, regardless of size. *See* 5 M.R.S. § 4553(4) (2011) (defining "employer" as "any person ... employing *any number* of employees" (emphasis added)).

The bill turned into a resolve requesting information from the Commission about how often complaints were filed alleging discrimination by supervisory employees when the employing entity had an affirmative defense to liability. Comm. Amend. A to L.D. 523, No. H–285 (121st Legis.2003); 1 Legis. Rec. H–618, S–665 (1st Reg.Sess.2003). Thus, the Legislature has had opportunities (1) to expressly incorporate supervisor liability, and (2) to expressly eliminate supervisor liability from the MHRA. It has declined to do either, leaving us to interpret the original language of the statute.

[¶ 29] We look then to other indicia of legislative intent, beginning with the Commission's interpretation. "When statutory terms are ambiguous, we defer to the agency's interpretation of a statute that is within its area of expertise unless it is unreasonable, that is, unless the statute plainly compels a contrary result." *Allied Res., Inc. v. Dep't of Pub. Safety*, 2010 ME 64, ¶ 21, 999 A.2d 940 (quotation marks and citation omitted). An agency's interpretation of an ambiguous statute is not conclusive. *Covanta Me., LLC v. Pub. Utils. Comm'n*, 2012 ME 74, ¶ 31, 44 A.3d 960 (Alexander, J., dissenting). We will reject an agency's interpretation if it is unreasonable or does not comport with the Legislature's intent. *See FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶¶ 24, 28, 926 A.2d 1197.

[¶ 30] The Commission is the state agency that administers the MHRA, *see* 5 M.R.S. § 4566 (2011); *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 26, 969 A.2d 897, and hears complaints alleging WPA violations pursuant to the procedures outlined in the MHRA, *see* 26 M.R.S. § 834–A (2011); *Me. Human Rights Comm'n*, 627 A.2d at 1007 n. 8. It is an independent body whose

five members are nominated by the Governor and confirmed by the Legislature. 5 M.R.S. §§ 4561–4562 (2011). The MHRA charges the Commission with the responsibility of administering its anti-discrimination provisions and "investigating all conditions and practices within the State which allegedly detract from the enjoyment, by each inhabitant of the State, of full human rights and personal dignity," and "all forms of invidious discrimination, whether carried out legally or illegally, and whether by public agencies or private persons." 5 M.R.S. § 4566. We have previously deferred to the Commission's expertise and applied its interpretation where we have found the MHRA's language to be ambiguous. *Watt*, 2009 ME 47, ¶¶ 26 n. 6, 27, 969 A.2d 897 (concluding that employers may be liable for sexual harassment by co-workers in case not involving direct review of agency action but in which agency submitted amicus brief).

[¶ 31] Since 1995, the Commission has interpreted the MHRA as providing for individual supervisor liability for employment discrimination, and it now urges the Court to conclude that the WPA also provides for individual supervisor liability.[10] As is evident from our discussion of the statutes, this interpretation is not inconsistent with the statutory language defining "employer," viewed in isolation. To determine the reasonableness of the Commission's interpretation, however, we must examine "the context of the whole statutory scheme of which the section[s] at issue form[ ] a part, so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Allied Res.*, 2010 ME 64, ¶ 21, 999 A.2d 940 (quotation marks omitted). We also look to the policies underlying the statutes for evidence of

---

10. Commission staff have interpreted the MHRA as providing for individual supervisor

liability since 1995, but the Commission did not officially take that position until 2003.

legislative intent. *HL 1*, 2011 ME 29, ¶ 17, 15 A.3d 725. Looking to the statutory scheme as a whole and its underlying policy, we conclude that the Commission's interpretation of the statutes exceeds legislative intent and is contrary to that intent.

[¶ 32] Both the MHRA and WPA seek to protect employees against discrimination by providing an avenue of recourse when they have been treated unfairly. *See* 5 M.R.S. § 4552 (2011) (stating that policy of MHRA is "to prevent discrimination in employment" on prohibited bases and to ensure that "corrective measures may, where possible, be promptly recommended and implemented"); *Bard v. Bath Iron Works Corp.*, 590 A.2d 152, 156 (Me.1991) ("The [WPA] embodies a statutory public policy against discharge in retaliation for reporting illegal acts, a right to the discharged employee, and a remedial scheme to vindicate that right."). Both definitions of "employer" at issue here, when read in light of those purposes and in the context of the statutory scheme, are meant to hold the principal/employer liable for acts of its agents/employees. *See* 5 M.R.S. § 4553(4) (defining "employer" to include the employer's agents); 26 M.R.S. § 832(2) (same); *see also* 5 M.R.S. § 4553(10)(E) (2011) (expressly stating that principles of vicarious liability apply); *DiCentes v. Michaud*, 1998 ME 227, ¶¶ 12–13, 719 A.2d 509 (concluding that WPA definition of "employer" incorporates respondeat superior liability into WPA).[11]

[¶ 33] By ensuring that the employee will be able to hold the ultimate employer accountable for rectifying discrimination, these acts seek to protect the employee's right to vindication even when the person who was directly responsible for the violation attempts to place the blame elsewhere, is powerless to correct it within the corporation, is unable to pay the penalty, or when there is no other legal recourse. *Cf. Doughty v. Work Opportunities Unltd./Leddy Group*, 2011 ME 126, ¶ 29, 33 A.3d 410 ("If the employee does not have a claim against a [third-party] 'employer' pursuant to the [Maine Workers' Compensation] Act, the employee may pursue a remedy for discrimination under the Maine Human Rights Act."). Employers, not employees, have the power and resources to remedy discrimination by implementing antidiscrimination policies, reinstating employees, or paying penalties. *See* Restatement (Third) of Agency § 2.04 cmt. b (stating that vicarious liability "reflects the likelihood that an employer will be more likely to satisfy a judgment," and that individual employees lack the incentive and ability to insure against liability beyond their individual liability or assets). The remedies and penalties expressly established in the MHRA are indicative of the Legislature's understanding of that fact, as they are clearly designed to apply to employers, not individual supervisors. *See* 5 M.R.S. § 4613(2)(B) (2007), *amended by* P.L.2007, ch. 243, § 8 (effective Sept. 20, 2007) (codified as amended at 5 M.R.S. § 4613(2)(B) (2011)).[12] The remedies available for employment discrimination are a cease-and-desist order; an order to employ or reinstate the victim with or without back pay; civil penal damages for employers with fourteen or fewer employees; and, for employers with more than

---

11. Because we concluded that there was no factual basis for individual liability in *DiCentes v. Michaud*, 1998 ME 227, ¶¶ 19–21, 719 A.2d 509, we did not have the occasion to decide the legal question presented here.

12. Title 5 M.R.S. § 4613(2)(B) was repealed and replaced by P.L.2007, ch. 695, § A–7 (effective Apr. 24, 2008) and has since been amended by P.L.2011, ch. 613, § 21 (effective Sept. 1, 2012) (to be codified at 5 M.R.S. § 4613(2)(B)), but the changes do not affect this appeal.

fourteen employees, compensatory and punitive damages commensurate to the size of the employer. *Id.* § 4613(2)(B)(1)-(2), (7)-(8).[13] Of these remedies, only a cease-and-desist order and civil penal damages could possibly apply to an individual supervisor, although it is unclear how civil penal damages would apply to individual supervisors in practice. *Id.* § 4613(2)(B)(1), (7).

[¶ 34] The MHRA's express incorporation of vicarious liability and its employer-specific remedies do not signal any intent to hold individual supervisors liable for employment discrimination. If the Legislature had intended to create individual supervisor liability it would have done so explicitly in much clearer terms. *See Damon v. S.D. Warren Co.*, 2010 ME 24, ¶ 23, 990 A.2d 1028 (rejecting hearing officer's interpretation of a statute where, had the Legislature intended that result, "it would likely have said so much more clearly"). In the absence of any clear indication to that effect, we will not undermine the purpose of these statutes by reading them to provide for individual supervisor liability. *See Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 19, 845 A.2d 1178 ("In construing statutes, we look to the overall purpose of the law of which the section at issue forms a part and strive to interpret the language to avoid results that are inconsistent, unreasonable, or illogical in relation to the law's overall purpose."). The dissent points to the provision of the MHRA that prohibits punitive damages against a governmental employee as an example of legislative intent to hold supervisors liable, *see* 5 M.R.S. § 4613(2)(B)(8)(i), but such a significant change in employment law would be much clearer and more direct.

[¶ 35] Because the statutory scheme as a whole and its underlying policy compel a different interpretation, we reject the Commission's reading of the statutes. Pursuant to either statutory definition of "employer," there is no individual supervisor liability for employment discrimination. We therefore affirm that portion of the trial court's judgment dismissing Fuhrmann's whistleblower claim against her individual supervisors.

The entry is:

Judgment affirmed with respect to the sex discrimination claim and the dismissal of Auger, LeMieux, Rodick, and Steppe as defendants; judgment vacated with respect to the whistleblower discrimination claim against Staples. Case remanded for further proceedings consistent with this opinion.

LEVY, J., with whom MEAD and GORMAN, JJ., join, concurring in part and dissenting in part.

[¶ 36] I concur that the summary judgment awarded to Staples should be vacated, but I respectfully dissent from the majority opinion's conclusion that Fuhrmann cannot maintain suit against her individual supervisors. Fuhrmann can sue her individual supervisors because (A) the Maine Human Rights Act's definition of "employer" in 5 M.R.S. § 4553(4) (2011) is unambiguous and encompasses individual supervisors within its terms, thus subjecting them to liability for their unlawful discrimination; and to the extent section 4553(4) is ambiguous, (B) we should interpret section 4553(4) in harmony with the other provisions of the MHRA, and (C) we should defer to the reasonable interpretation of the Maine Human Rights Commis-

---

**13.** The MHRA also provides for awards of attorney fees to prevailing parties. 5 M.R.S. § 4614 (2011).

sion, both of which also result in individual supervisor liability.

A. The language of section 4553(4) is unambiguous and defines "employer" to include individual supervisors, thus subjecting them to liability for their unlawful discrimination pursuant to section 4572

[¶ 37] Pursuant to the MHRA, "any employer" who commits employment discrimination against an employee for protected whistleblowing activities commits unlawful employment discrimination. 5 M.R.S. § 4572(1)(A) (2011); 26 M.R.S. § 833(1)(A) (2011). An "employer" includes "any person acting in the interest of any employer, directly or indirectly." 5 M.R.S. § 4553(4).[14] Thus, when individual supervisors act in the interest of their employers, they, too, are "employers" within the meaning of section 4572(1)(A). *See id.* And when those individual supervisors commit employment discrimination against an employee for protected whistleblowing activities, they commit unlawful employment discrimination. *See id.* § 4572(1)(A); 26 M.R.S. § 833(1)(A).

[¶ 38] When unlawful discrimination occurs, the injured party's remedy is to file suit "against the person or persons who committed the unlawful discrimination." 5 M.R.S. § 4621 (2011). The MHRA defines a "person" to include "one or more individuals." *Id.* § 4553(7) (2011). Thus, when unlawful employment discrimination occurs, the injured party may file suit against any individual responsible for the unlawful discrimination. *See id.* §§ 4553(7), 4621. Because individual supervisors acting in the interest of their employer can commit unlawful employment discrimination, *see id.* § 4572(1)(A), individual supervisors are among the individuals against whom a plaintiff may file suit, *see id.* §§ 4553(7), 4621.

[¶ 39] No ambiguity is present here. By its plain language, the MHRA allows a plaintiff to file suit against individual supervisors, acting in the interest of their employers, who unlawfully discriminate. However, even if section 4553(4) is treated as ambiguous, its interplay with other statutory provisions would counsel the same result.

B. We should interpret section 4553(4) in harmony with other provisions in the MHRA

[¶ 40] As the majority opinion states, "statutes must be read together and in light of the entire statutory scheme to produce cohesive results." Majority Opinion ¶ 27 (citing *Adoption of Tobias D.,* 2012 ME 45, ¶ 15, 40 A.3d 990). Yet, the majority opinion's construction of section

14. Section 4553(4) defines "employer" to include three separate, distinct categories, separated by semi-colons:

"Employer" includes any person in this State employing any number of employees, whatever the place of employment of the employees, and any person outside this State employing any number of employees whose usual place of employment is in this State; any person acting in the interest of any employer, directly or indirectly; and labor organizations, whether or not organized on a religious, fraternal or sectarian basis, with respect to their employment of employees.

5 M.R.S. § 4553(4) (2011). Grammatically, this provision unmistakably treats the second category of "employer"—"any person acting in the interest of any employer, directly or indirectly"—as distinct from the first category of "employer," which describes the employing person or entity with whom the plaintiff maintained an actual employment relationship. The second category of employer is no more a part of, or subsumed by, the first category of employer than is the third category of "employer" addressing labor organizations.

4553(4), which would deny individual supervisor liability, renders a portion of the MHRA meaningless and superfluous.

[¶ 41] Title 5 M.R.S. § 4613(2)(B)(8)(i) (2011) states that "[p]unitive damages may not be included in a judgment or award ... *against an employee* of a governmental entity based on a claim that arises out of an act or omission occurring within the course or scope of that employee's employment." 5 M.R.S. § 4613(2)(B)(8)(i) (emphasis added). If there is no potential liability for individual employees who meet the definition of "employer" pursuant to the MHRA, including supervisory employees, as the majority opinion concludes, then there would be no need to limit their liability for punitive damages, and that language becomes meaningless. *But see Blue Yonder, LLC v. State Tax Assessor,* 2011 ME 49, ¶ 10, 17 A.3d 667 ("Words in a statute must be given meaning and not treated as meaningless and superfluous." (quotation marks omitted)).

[¶ 42] Thus, we should interpret section 4553(4) to accommodate the individual supervisor liability contemplated in section 4613. *See id.* Not surprisingly, the Maine Human Rights Commission has long held to that interpretation, and that interpretation is reasonable.

C. The reasonable interpretation of the Maine Human Rights Commission, recognizing individual supervisor liability, deserves deference

[¶ 43] The Commission has consistently interpreted the MHRA to permit individual supervisor liability. We should therefore exercise restraint and defer to that interpretation because it is reasonable and because the MHRA does not compel a contrary interpretation. *See* Majority Opinion ¶ 23 ("When a statute administered by an agency is ambiguous, we 'review whether the agency's interpretation

of the statute is reasonable and uphold its interpretation unless the statute plainly compels a contrary result.'" (quoting *Goodrich v. Me. Pub. Emps. Ret. Sys.,* 2012 ME 95, ¶ 6, 48 A.3d 212)).

[¶ 44] The Commission's construction of section 4553(4) is consistent with the plain language of the MHRA as a whole, including its section on remedies, 5 M.R.S. § 4613(2)(B) (2011). It is true, as the majority opinion observes, that some of the available remedies for discrimination "are clearly designed to apply to employers, not individual supervisors." Majority Opinion ¶ 33. This observation is entirely consistent with the Commission's interpretation. The remedies provision states that a court finding unlawful discrimination "must specify an *appropriate* remedy or remedies," and that those "remedies *may* include, but are not limited to" the remedies cited by the majority opinion as inconsistent with individual supervisor liability. 5 M.R.S. § 4613(2)(B) (emphasis added). Thus, the remedies provision is only inconsistent with individual supervisor liability if we ignore the Legislature's directive that a court should select an *appropriate* remedy from the optional, nonexhaustive list provided by the statute.

[¶ 45] The Commission's construction of section 4553(4) is also consistent with the purposes of the MHRA, and with the liberal construction we use to further those purposes. *See DiCentes v. Michaud,* 1998 ME 227, ¶ 10, 719 A.2d 509; *Dir. of the Bureau of Labor Standards v. Cormier,* 527 A.2d 1297, 1300 (Me.1987).

[¶ 46] One of the purposes of the MHRA is "to prevent discrimination in employment." 5 M.R.S. § 4552 (2011). By subjecting individual supervisors to a potential lawsuit for their unlawful employment discrimination, the Commission's construction directly discourages individual supervisors from discriminating by cre-

ating a disincentive. In contrast, the majority opinion's construction creates no such disincentive to discriminate. Thus, not only does the Commission's interpretation discourage employment discrimination, it also furthers that purpose to a greater extent than the construction adopted by the majority opinion, making it a preferable interpretation. *See Cormier*, 527 A.2d at 1300.

[¶ 47] Another purpose of the MHRA is to remedy employment discrimination that has previously occurred. *See* 5 M.R.S. § 4613(2)(B). When an individual supervisor has committed employment discrimination, the Commission's construction gives the plaintiff a remedy against both the supervisor, pursuant to section 4553(4), as well as the supervisor's employer, pursuant to section 4553(10)(E) (2011), which plainly recognizes the applicability of vicarious liability.[15] In contrast, the construction adopted by the majority opinion provides plaintiffs with a remedy against only the supervisor's employer. This construction creates a gap in the context of injunctive relief, by creating the potential for employment discrimination to remain unabated if upper management fails to reign in a problematic supervisor. It is far more likely that an individual supervisor will stop personally discriminating against an employee if the supervisor knows that a failure to do so could result in a judicial contempt proceeding for violating "[a]n order to cease and desist from the unlawful practices," pursuant to 5 M.R.S. § 4613(2)(B)(1). Thus, by providing remedies against both the employer as an entity and against any individual supervisors who commit unlawful discrimination, the Commission's construction strengthens the judicial remedies of the MHRA, thereby furthering its purposes. The majority opinion's construction weakens those remedies.

[¶ 48] The majority opinion's conclusion—that the MHRA plainly compels an interpretation contrary to the Commission's—is plainly wrong. There is no sound basis to conclude that the Commission's construction of section 4553(4) is inconsistent with any provision of the MHRA, nor to conclude that sheltering individual supervisors from liability for their discriminatory acts better advances the purposes of the MHRA—a law intended to deter and provide remedies for discrimination. We should defer to the Commission's interpretation of section 4553(4), because it furthers the purposes of the MHRA while remaining consistent with the plain language of section 4553(4) and the MHRA as a whole. *See Goodrich*, 2012 ME 95, ¶ 6, 48 A.3d 212.

D. Conclusion

[¶ 49] In keeping with the plain meaning of section 4553(4), the statute as a whole, and the Commission's consistent, reasonable interpretation of section 4553(4), we should conclude that individual supervisors acting in the interest of their employers may be liable for the discriminatory acts they commit.[16] To the

---

**15.** Title 5 M.R.S. § 4553(10)(E) (2011) states: "In determining whether a person is acting as an agent or employee of another person so as to make such other person responsible for that person's acts, the question of whether the specific acts performed were actually authorized or subsequently ratified is not controlling."

**16.** Because the question of individual supervisor liability is presented in the context of a motion to dismiss, the parties have not briefed, and I do not examine, the *scope* of supervisor liability imposed by the MHRA or whether, according to the facts of this case, the individuals named by Fuhrmann in her complaint should be considered "employers." *See Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417–18 (3d Cir.2012)

extent that one disagrees with the policy choices implicit in the plain language of the statute, the appropriate forum to re-examine those choices is the Legislature, not this Court. *See Whitney v. Wal–Mart Stores, Inc.*, 2006 ME 37, ¶ 27, 895 A.2d 309 (observing that "[i]f a legislative policy concern is valid, the appropriate body to address that concern is the Maine Legislature, it is not to seek amendment of the law by judicial action"). For these reasons, Fuhrmann's claims against her individual supervisors should be reinstated.

(discussing the "economic reality" test used by federal courts to determine whether an individual supervisor had sufficient authority, control, and responsibility to function as an employer for the purpose of imposing individual liability pursuant to the FLSA and FMLA); *see also Dir. of the Bureau of Labor Standards v. Cormier*, 527 A.2d 1297, 1299–1300 (Me. 1987) (approving trial court's reliance on FLSA cases and the use of an "economic reality" analysis for determining employers' relationship in state law wage and hour case).