3113170141    ENTERED OCT 2 4 2014

STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss                          CIVIL ACTION
                                        DOCKET NO. CV-12-431

SANDRA J. MORISON,

    Plaintiff

    v.                                  ORDER ON MOTION FOR
                                        SUMMARY JUDGMENT

HANNAFORD BROS. CO.,                    STATE OF MAINE
                                        Cumb     nd    Clerk's Office
    Defendant.                          MAR 14 2014

                                        RECEIVED

    Defendant Hannaford Brothers Co. moves the Court for summary

judgment on both counts of plaintiff Sandra Morison's complaint for

employment discrimination. For the following reasons the motion is denied.

## BACKGROUND

    The following facts are presented in a light most favorable to Morison, the

non-moving party. In June 2009, Morison applied for a cashier position at the

Hannaford in Gorham, Maine and was hired on August 8, 2009. (Add. S.M.F. ¶ 1;

Supp. S.M.F. ¶ 3.) According to Morison, she requested in her application to have

every Sunday off for the entire day so she could attend church.[1] (Add. S.M.F.

¶¶ 1-2.) Morison notified Audrey Laskey, the Associate Relations Manager for

the store, who informed Amanda Brown,[2] Morison's supervisor, of the requested

accommodation. (Add. S.M.F. ¶¶ 1, 4.) Brown was responsible for scheduling

and placing accommodations into the automated Kronos work scheduler, which

tracks employee availability. (Add. S.M.F. ¶¶ 5-7.)

---

[1] Defendant states that Morison initially requested only Sunday mornings off to attend church. (Supp. S.M.F. ¶ 6.)

[2] Amanda Brown's maiden name is Whitehead, and she is often identified by this name in the summary judgment record. (Reply S.M.F. ¶ 92.)

Despite Morison's alleged request to have Sundays off, over time, Hannaford started scheduling Morison to work on Sundays. (Add. S.M.F. ¶ 21.) Hannaford scheduled her to work a total of 18 Sundays over the course of her employment, including several Sunday mornings. (Add. S.M.F. ¶ 22; Supp. S.M.F. ¶ 8; Opp. S.M.F. ¶ 8.) Morison was scheduled to work on Sunday May 15, 2011. (Add. S.M.F. ¶ 23.) Morison asked her supervisors Mallory Roubo and Brown whether she could have Sundays off for church, but they did not address her requests.[3] (Add. S.M.F. ¶ 24; Morison Dep. 137:1-2.) On May 22, 2011, Morison contacted Ken Kierstead of corporate human resources about Hannaford's failure to accommodate her request to not work on Sundays. (Add. S.M.F. ¶¶ 25-26.) Morison authorized Kierstead to use her name to discuss the issue with local management, but stated, "as for my name, the only worry I have is I may lose my job..." (Add. S.M.F. ¶ 27.)

Kierstead emailed Laskey and told her to look into the accommodation. (Add. S.M.F. ¶ 30.) In the email, Kierstead wrote, "She is very worried that they will retaliate against her, so remind them not to take any punitive action against her for bringing this up. That would violate the policy and the law!" (Add. S.M.F. ¶ 31.) Laskey told Brown about Morison's complaints to Kierstead. (Add. S.M.F. ¶ 31.) Brown told Laskey that Morison had been talking with other co-workers "about how she is being scheduled on Sundays and it is not fair after she has brought this up numerous times to management." (Add. S.M.F. ¶ 33.) Laskey warned Brown not to confront Morison about the comments "because it would

---

[3] Defendants object to plaintiff's additional statement of fact paragraph 24, which cites to an email from Morison to Ken Kierstead in which she states that she complained to her managers. (Reply S.M.F. ¶ 24.) Defendants are correct that the email is inadmissible hearsay. However, Morison was questioned about the email in her deposition and testified "they were still scheduling me after I requested Sundays off." (Morison Dep. 137:1-2.)

2

look like retaliation and we do not want to go create that perception." (Add. S.M.F. ¶ 34.)

After Morison emailed Kierstead in May 2011, Morison claims local management began to harass her. (Add. S.M.F. ¶ 35.) She claims her managers issued baseless disciplinary warnings, which they forced her to sign, changed her schedule without warning, and instructed a co-worker not to speak with her.[4] (Add. S.M.F. ¶¶ 37-38.) Morison also claims that Laskey and Brown referred to Morison as "too old" and a "holy Christian" or "holy roller." (Add. S.M.F. ¶ 39; Morison Dep. 98, 118-123.) Morison repeatedly complained to Kierstead that she was being treated unfairly. (Add. S.M.F. ¶¶ 45, 49-52, 61, 71-73, 75, 107-110.)

Defendant claims the evidence shows that Morison simply progressed through Hannaford's normal disciplinary process until she was fired. On August 8, 2009, Morison received a copy of Hannaford's tobacco sales policy, and on October 6, 2009 she received an updated policy on employee meal and rest breaks. (Supp. S.M.F. ¶¶ 26-27.) Hannaford's "Performance Counseling" policy outlines the following progressive disciplinary plan:

- Coaching and Feedback
- Step One: Verbal Warning
- Step Two: First Written Notice
- Step Three: Final Written Notice
- Step Four: Final Disciplinary action up to and including termination
- Mandatory Review

(Add. S.M.F. ¶ 15.) The meal/break policy states:

> If you have three violations in a week (Sunday – Saturday), you will receive a Verbal Warning. If you have a second occurrence of violations in

---

[4] Defendant argues that the statements from co-workers to Morison that they were instructed not to speak to Morison are inadmissible hearsay. (Reply S.M.F. ¶ 38.) In her deposition, however, Morison testified that she personally overheard Laskey and Brown force one co-worker to sign a document "against Sandy." (Add. S.M.F. ¶ 38; Morison Dep. 94-96.)

3

a week within a rolling six-week period, you will receive a Confidential Documentation. If a third occurrence of three violations in a week happens within a rolling 6-week period, you will receive the next Step in your file.

(Add. S.M.F. ¶ 10; Morison Dep. Ex. 1.)

According to Morison's interpretation of the policy, if three violations do not occur within the same week during the six weeks after an employee receives a Confidential Documentation, the process starts over and the next violation should be a verbal warning.[5] (Add. S.M.F. ¶ 11.) Morison also believes that the meal/break policy violations are subject to a distinct disciplinary process that does not overlap with the "performance counseling" process. (Add. S.M.F. ¶ 16.) Although Morison has produced evidence that the disciplinary policy is inconsistently applied, her record citations do not support her theory that meal/break policy violations are subject to a wholly distinct disciplinary process. (Add. S.M.F. ¶¶ 16-17; Laskey Dep. 22:3-15.) In her deposition, Laskey merely states that an employee at step three in the disciplinary process would not necessarily be fired "if six weeks had passed within her last meal/break violation." (Reply S.M.F. ¶ 16; Laskey Dep. 22:3-15.)

Between August 8, 2009 and May 15, 2011, before Morison contacted Kierstead, Morison's personnel file showed eleven warnings for meal/break violations. (Supp. S.M.F. ¶ 32a-g.) Hannaford concedes that meal/break violations occur often. (Add. S.M.F. ¶ 12.) Morison received warnings for issues such as taking long breaks, requiring time card manual corrections, and taking meal periods shorter than thirty minutes. (Supp. S.M.F. ¶ 32a-g.) Hannaford

---

[5] Defendant claims the policy is applied so that an employee will only receive one verbal warning in the entire course of her employment. (Reply S.M.F. ¶ 11.) This is a genuine issue of material fact for the fact-finder to resolve.

4

issued Morison a step one for having three or more meal/break violations in a single week on September 5, 2010. (Supp. S.M.F. ¶ 32g.) On February 5, 2011, Morison received a performance evaluation, which stated, "Sandy has received documentation for breaks, lunches but has made a great effort . . . in correcting this issue." (Supp. S.M.F. ¶ 32i.) Morison denies receiving four Confidential Documentations for meal/beak violations that are unsigned but in her personnel file and dated after her performance evaluation in February 2011. (Supp. S.M.F. ¶ 32; Morison Dep. 29-32.)

In addition to meal/break violations, Morison was issued disciplinary warnings for other issues during the same time period. On January 31, 2011, Morison was issued a "performance counseling" step one for ringing two orders together, which resulted in an overcharge to the customer. (Supp. ¶ 32h.) On March 28, 2011, Morison was issued a step two warning for the same issue. (Supp. ¶ 32k.)

After Morison complained to Kierstead in May 2011, Morison claims she received unwarranted disciplinary warnings. On August 8, 2011, Laskey issued Morison a Confidential Documentation for four meal/break violations in the previous week. (Add. S.M.F. ¶ 40.) Two of these violations were issued because Morison worked more than six hours without a half-hour meal break. (Add. S.M.F. ¶ 41.) Morison worked more than six hours on these two occasions without a break because her supervisors, who are responsible for ensuring employees take breaks, never came to relieve her. (Add. S.M.F. ¶¶ 42-43.) Because Morison was not relieved for her meal breaks on those two occasions, she was instructed to take longer breaks later in the day, which resulted in the other two violations. (Add. S.M.F. ¶ 44.) Morison complained to Kierstead about

5

the violations, and he agrees with Morison that, if her allegations are correct, she should not have been issued the Confidential Documentation. (Add. S.M.F. ¶ 47.)

On August 22, 2011, Morison received a step three warning for failing an internal tobacco audit conducted on July 14, 2011. (Supp. S.M.F. ¶ 34.) Morison denied failing the audit and emailed Kierstead to complain about the warning. (Add. S.M.F. ¶ 49.) Morison believes the failed audit could have resulted from her being forced to use other employees' cash registers under their employee numbers. (Add. S.M.F. ¶¶ 49, 72.) It is against company policy for an employee to use a cash register under another employee's number. (Add. S.M.F. ¶ 70.)

On August 28, 2011, Brown issued Morison a Confidential Documentation for meal/break violations. This Confidential Documentation once again concerned Morison working more than six hours without taking a meal and subsequently taking long breaks. (Add. S.M.F. ¶¶ 53-54.) Morison refused to sign the document and reported the matter to Kierstead. (Add. S.M.F. ¶ 57.)

On September 2, 2011, Brown sent Laskey an email stating "she would not be surprised if Sandy gave her two weeks, because from the sounds of things she (Sandy) was not happy with the ways things were happening here." (Add. S.M.F. ¶ 79.) Brown never spoke with Morison about issues she was having or her complaints to Kierstead. (Add. S.M.F. ¶¶ 81, 87-89.).

On September 15, 2011, Brown prepared a Confidential Documentation for Morison in which she claimed that Morison refused to work cash registers under another employee's number, complained about her schedule and breaks, and made another associate cry. (Add. S.M.F. ¶ 83.) Morison denies all of the allegations in this Confidential Documentation. (Add. S.M.F. ¶ 84.)

On September 20, 2011, Hannaford was busy and Morison was working a cash register. (Add. S.M.F. ¶¶ 90-91.) Morison testified that Brown came to her register upset. (Add. S.M.F. ¶ 91.) Brown asked Morison to run another register under Brown's employee number. (Add. S.M.F. ¶ 92.) Morison refused to run the register under Brown's number but offered to run the register under her own number. (Add. S.M.F. ¶¶ 93-94.) According to Morison, Brown became hysterical and ran upstairs. (Add. S.M.F. ¶ 94.) After the incident, store manager Tim Perry told Morison to take the rest of the day off, telling her that going home was not a form of punishment. (Add. S.M.F. ¶ 95.)

Kierstead came to the store to speak with Brown, Laskey, and Perry about the incident. (Add. S.M.F. ¶ 96.) The four of them met for half an hour, reviewed Morison's file, and discussed how to proceed. (Add. S.M.F. ¶ 97.) Morison's allegations about a subsequent meeting with Perry are not supported by the record citation. (Add. S.M.F. ¶ 98; Morison Dep. 47.)

According to scheduling records, Morison worked on Sunday October 2, 2011. (Add. S.M.F. ¶ 112.) Two weeks later, on October 16, 2011, Brown issued Morison a Confidential Documentation for meal/break violations for the week ending on October 15, 2011. (Add S.M.F. ¶ 114.) Brown testified that Morison did not receive a verbal warning because she assumed Morison "had other violations leading up to that." (Add. S.M.F. ¶ 115; Morison Dep. 66.) Morison did not have three violations in one week within the six weeks before October 16, 2011. (Add. S.M.F. ¶ 118.)

On October 23, 2011, Morison was fired for having four meal/break violations for the week ending on October 23, 2011. (Add. S.M.F. ¶ 119.) According to Morison, Perry called her to his office and told her that she had

7

made a "boo-boo" and that she was fired. (Add. S.M.F. ¶ 120.) Morison was the only employee at the Gorham store to be fired for meal/break violations. (Supp. S.M.F. ¶ 53.) Laskey, who has worked as an Associate Relations Manager for Hannaford for 22 years, is not aware of Hannaford firing any other employee in the company for meal/break violations. (Add. S.M.F. ¶ 14.)

Morison received a right to sue letter from the Maine Human Rights Commission and filed her complaint on October 19, 2012. Hannaford filed its motion for summary judgment on December 2, 2013.

## DISCUSSION

### 1. Standard of Review

"Summary judgment is appropriate when there is no genuine issue of material fact that is in dispute and, at trial, the parties would be entitled to judgment as a matter of law." *Fitzgerald v. Hutchins*, 2009 ME 115, ¶ 9, 983 A.2d 382. "An issue is genuine if there is sufficient evidence supporting the claimed factual dispute to require a choice between the differing versions; an issue is material if it could potentially affect the outcome of the matter." *Brown Dev. Corp. v. Hemond*, 2008 ME 146, ¶ 10, 956 A.2d 104. To overcome a motion for summary judgment, "the plaintiff must establish a prima facie case for each element of her cause of action." *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 21, 969 A.2d 897 (quoting *Blake v. State*, 2005 ME 32, ¶ 4, 868 A.2d 234).

### 2. Religious Discrimination

The Maine Human Rights Act ("MHRA") makes it unlawful for an employer to discriminate against an employee on the basis of religion. 5 M.R.S. § 4572(1)(A) (2013). Under Maine Human Rights Commission ("MHRC") regulations, "[t]he duty not to discriminate on religious grounds includes an

8

obligation on the part of the employer . . . to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship to the conduct of the employer's business." 94-348 C.M.R. Ch. 3, § 3.10(C)(1) (2013). Plaintiff alleges that Hannaford unlawfully discriminated against her by failing to accommodate her request to have Sundays off from work to attend church.

To prevail on a claim for religious discrimination, "the employee must show that: (1) a *bona fide* religious practice conflicts with an employment requirement; (2) that he or she brought the practice to the employer's attention; and (3) that the religious practice was the basis for an adverse employment decision."[6] *Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.*, 673 F.3d 1, 8, (1st Cir. 2012) (internal quotation omitted). If the plaintiff can establish a prima facie case, "the employer must show that it offered a reasonable accommodation *or* that a reasonable accommodation would be an undue burden." *Id.* (emphasis in original).

Defendant challenges whether plaintiff can meet the third element, causation, of the prima facie case. In the disability discrimination context, the Law Court reversed a decision of the trial court that concluded that the summary judgment record could not establish the causation element:

> Although there is conflicting evidence on this issue, there is some evidence of animus based on Daniels's disability that could permit a fact-finder to conclude that Daniels was fired for discriminatory reasons. This sort of factual dispute must be resolved through fact-finding, even if Daniels's likelihood of success is small.

---

[6] The Law Court has instructed that, "because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48.

*Daniels v. Narraguagus*, 2012 ME 80, ¶ 17, 45 A.3d 722. The *Daniels* court stressed that "discrimination claims in general are often difficult to assess at the summary judgment stage, and particularly . . . 'the issue of whether an employee has generated an issue of fact regarding an employer's motivation or intent is one heavily dependent on the individual facts before the court.'" *Id.* ¶ 15 (quoting *Cookson v. Brewer Sch. Dept.*, 2009 ME 57, ¶ 21, 974 A.2d 276).

The Court concludes that Morison has produced sufficient evidence that would allow a fact-finder to find that she was fired for discriminatory reasons. Morison claims that she originally requested to have Sundays off for church when she applied for the job. She further claims that she complained to her managers after they scheduled her to work on Sundays, but they did not correct the issue. Only after she complained to Kierstead of corporate human resources was Morison's availability adjusted on the automated scheduler to reflect her requested accommodation. After contacting Kierstead, Morison claims that her local managers started treating her poorly, including making religious references about her, such as calling her "holy Christian" or "holy roller." Morison has also produced evidence that many of the disciplinary actions taken against her following her complaints to Kierstead are baseless and that she should not have been fired based on Hannaford's disciplinary policy. Finally, she has produced evidence that no other employee at the Gorham store has been fired, as she was, for meal/break violations, which Hannaford admits occur frequently. Considering this evidence, a rational juror could conclude that Morison was terminated for discriminatory reasons.

Hannaford argues that, even if Morison can demonstrate a prima facie case, it accommodated her request and therefore it cannot be liable for

10

discrimination. This argument fails for two reasons. First, Morison claims that Hannaford continued to schedule her to work on Sundays, even after she contacted Kierstead. Scheduling records from Hannaford show that she was scheduled to work on Sunday October 2, 2011. Thus, there is a genuine issue of material fact as to whether Hannaford did accommodate Morison. Second, Morison's claim is that local management began issuing baseless disciplinary warnings to Morison after Kierstead adjusted her schedule. Thus, a rational fact-finder could infer that, even if she was given Sundays off, local management continued to discriminate against her on the basis of her religion, and that discrimination ultimately led to her termination in October 2011.

3. Retaliation

In count II of the complaint, Morison alleges that Hannaford retaliated against her after she requested a religious accommodation. The Court applies a "a three-step, burden-shifting analysis to determine whether (1) the employee has presented prima facie evidence of discrimination; (2) the employer has presented prima facie evidence of a legitimate non-discriminatory reason for the adverse action; and, in response, (3) the employee has presented prima facie evidence that the employer's proffered reason is pretextual or untrue." *Fuhrmann v. Staples Office Superstore E., Inc.*, 2012 ME 135, ¶ 13, 58 A.3d 1083. "To establish a prima facie retaliation claim, [Morison] must demonstrate that [she] engaged in a statutorily protected activity, that [Hannaford] made an employment decision that adversely affected [her], and that there was a causal link between the two." *Daniels*, 2012 ME 80, ¶ 21, 45 A.3d 662. Under MHRC regulations, "[n]o employer . . . shall discharge or otherwise discriminate against any employee . . . because of any action taken by such employee . . . to exercise their rights under the Maine

11

Human Rights Act . . . ." 94-348 C.M.R. Ch. 3, § 3.13 (2013). Defendant does not dispute that plaintiff's request for a religious accommodation is protected under the Act. The first issue is whether the plaintiff has produced sufficient evidence to link the request for an accommodation to an adverse employment decision.

The Law Court has stressed that "retaliation is a separate claim that does not require there to have been underlying discrimination." *Daniels*, 2012 ME 80, ¶ 22, 45 A.3d 722. As the *Daniels* court explained, "[i]n the discrimination context, causation links *disability status* to discharge, whereas in the retaliation context, causation links *protected activity* to discharge." *Id.* (emphasis in original).

The Court again concludes that plaintiff has met her burden of production on the causation requirement. Although the Court is mindful of the distinction between discrimination and retaliation claims, many of the facts alleged by plaintiff would allow a fact-finder to conclude she was either the victim of discrimination or retaliation. Morison claims that her managers began harassing her after she contacted Kierstead to request Sundays off. She claims they instructed another co-worker not to speak to her. In addition, she claims that her managers began issuing her baseless disciplinary violations within several months following her complaint to Kierstead. Morison also produced evidence showing that Hannaford failed to take any action to address Morison's reasonable complaints to management. Viewing these facts in a light most favorable to Morison, she has met her burden on causation.

Hannaford has also met its burden to show a legitimate, non-discriminatory reason for firing Morison. Hannaford produced evidence that Morison had disciplinary violations before she emailed Kierstead with her request to have Sundays off work and that Morison's personnel file shows

12

progressive levels of disciplinary violations that ultimately resulted in her termination. Thus, Hannaford's evidence appears to show that Morison was fired for violating the standard disciplinary policies in effect at the store.

The final step in the analysis is whether Morison has produced evidence to show that Hannaford's reasons for firing her were pretextual. In *Cookson*, the Law Court explained, "the rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Cookson*, 2009 ME 57, ¶ 16, 974 A.2d 276. Morison has produced evidence that suggests many of her citations for meal/break violations were not her fault because her supervisor failed to give her meal breaks. Morison has shown that there is a dispute about how the disciplinary policy is applied. Under Morison's theory, an employee should receive a verbal warning for new meal/break policy violations if the employee has no violations in the previous six weeks. If this theory is correct, Morison should not have been terminated for her violations in the week leading up to her termination. Finally, Morison has shown that she is the only employee to have ever been fired for meal/break violations at the Gorham store. Taking these facts together, the Court finds that a fact-finder could reject Hannaford's proffered reasons for firing Morison.

The entry is:

Defendant's motion for summary judgment is DENIED.

Dated: 3\13\14

Joyce A. Wheeler
Justice, Superior Court

13