STATE OF MAINE
ANDROSCOGGIN, ss.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-13-176

JANET ENOS,

Plaintiff

v.

RECEIVED & FILED
**NOV 20 2015**
ANDROSCOGGIN
SUPERIOR COURT

JUDGMENT

ORTHOPEDIC & SPINE PHYSICAL
THERAPY OF L/A, INC.,

Defendant

On February 17 and 18, 2015,[1] a bench trial was held on plaintiff, Janet Enos, complaint that her employer, Orthopedic & Spine Physical Therapy of L/A, Inc. ("OSPT"), unlawfully terminated her employment in violation of the Maine Whistleblower's Protection Act, 26 MRS §833(1).

## FINDINGS OF FACT[2]

OSPT is an incorporated, independent outpatient physical therapy practice, owned by Shan Teixeira ("Teixeira"). Between February 2007 and April 2013, OSPT had two employees: Teixeira, the physical therapist and Janet Enos ("Enos") the receptionist/office manager. Teixeira terminated Enos' employment with OSPT on April 19, 2012.

As the only health care provider, Teixeira was responsible for seeing and treating patients, completing all patient and treatment documentation, patient "in and out" times as well as diagnosis and billing codes. Teixeira's duties also included supervising Enos and preparing her annual reviews and evaluations.

---

[1] The court apologizes to the parties and counsel for the extended time it has taken to render judgment.

[2] The court's findings of fact and conclusions of law are based upon the court's review and consideration of the court's file, including but not limited to the pleadings, the court's order on Defendant's motion to dismiss and counsels' trial briefs. The court has also considered the parties' testimony, the 7/25/14 deposition transcript of Teixeira, the exhibits presented at trial (except Nos. 16, 29, 30, 56, 59, 63, 68, 76-87, 105 and summary included in exhibit No. 107), the court's trial notes, the Whistleblower's Protection Act, 26 M.R.S. §831, et seq. and the relevant case law.

1

As the receptionist/office manager, Enos was responsible for answering the phones, greeting patients, entering patient insurance and demographic information, setting up patient files, sending bills to outside services, ordering supplies and general office maintenance. Enos was not responsible for, nor did she ever provide or prepare, patient treatment or treatment notes. She never determined a patient's diagnosis or billing codes. And, she never recorded "in and out" times spent with patients.[3]

For the first two years, Teixeira and Enos appear to have worked fairly well together at OSPT. In her 2007 and 2008 reviews, Teixeira wrote that Enos was "overall doing an excellent job with office work, billing, keeping meticulous track of our finances, and with assisting with many other ancillary projects and tasks at OSPT."[4] He also listed areas for improvement including, but not limited to, "continue to learn more about billing and insurance coverage," and "stay abreast on insurance changes ([e.g.] reading mail flyers, and periodically reading updates online)." In 2008 Teixeira added, "Keep closer track of active/inactive patients." Enos was given an 8% pay raise and an additional week of paid leave in 2007 and a 4% pay increase in 2008. *See* Joint Exhibits 64 and 65.

The first indication that there was a problem in their working relationship arose after Enos' 2008 review and 4% pay increase. Enos had expected she would receive a greater salary increase. Instead of discussing the matter with Teixeira, Enos simply stopped speaking to him.[5] When Teixeira learned the reason for Enos "silent treatment," he started having concerns that her conduct was "unprofessional" and "disrespectful." Despite these concerns, Teixeira continued to appreciate Enos' clerical skills.

Teixeira asked Enos to attend a one-day continuing education course on physical therapy coding and billing on August 14, 2009. According to Enos, she found the course helpful. She was able to understand and apply the reading, including Medicare and MaineCare rules and regulations, to the practical aspects of her job.

---

[3] On at least one occasion, however, Enos did point out that Teixeira had billed too little and he went back and changed it.

[4] In his 2008 review, Teixeira did not describe Enos' tracking of OSPT's finances as "meticulous."

[5] Enos stopped saying "Good Morning" and "Good Night" to Teixeira on other occasions as well. *See* Joint Exhibit 21.

On August 18, 2009, Teixeira asked Enos about the course. She provided him with a page of bullet points. She wrote, in part, "No more free or reduced visits!" "All copays must be paid (including your girlfriend)..." "People with health insurance cannot have the self pay option." *See* Joint Exhibit 2. Enos explained that her purpose in preparing the written summary was to bring to Teixeira's attention that certain things OSPT did in the practice violated Medicare and MaineCare rules and regulations. She also wanted to let him know that OSPT needed to develop written policies that would apply to all patients.

Teixeira was offended by the manner in which Enos prepared the summary. He also had questions about some of her comments, particularly those pertaining to pro bono work. He talked to other physical therapists and learned that, as long as OSPT is uniform in how it is done, he could continue to do some pro bono work. Teixeira tried to speak with Enos about what he had learned from the other physical therapists, but Enos did not want to talk about it. She said it had to stop because "it's illegal." Teixeira did not understand why Enos simply dismissed out of hand the information he relayed to her. He concluded she was attempting to dictate policy by telling him what OSPT could and could not do going forward.

On August 19, 2009, Teixeira prepared a written response to Enos' bullet points. While his note admonished her for trying to institute and mandate new policies, his primary focus was her "approach and attitude," which he found to be disrespectful and overstepping boundaries. He reminded her that *he had brought these concerns to her in the past* and referenced the "Send Out Cards."[6] (Emphasis supplied.) He wrote, "I do not mind that you expressed a disfavor for this approach, in fact, I appreciate and value your input (although it may not always appear that way). What I do not appreciate is the attitude and persistent negativity and resistance that have followed." *See* Joint Exhibit 4.

---

[6] Teixeira wanted Enos to prepare "Send Out Cards," a marketing tool, for patients. For some reason, perhaps because she thought it was a HIPAA violation, Enos expressed her dislike of the idea and said it was "stupid." Unbeknownst to Teixeira, Enos subsequently contacted the Consumer Mediation Division of the Office of the Attorney General to inquire about the practice and received a response from AAG Paul Gauvreau, dated September 4, 2009. *See* Joint Exhibit 10.

Teixeira referenced other conduct that caused him concern. He wrote, "[I]f I ask you to do something...you come back with "no you can do it." He also wrote, "[W]hen you do as you please and disregard my clear instructions you are being disrespectful."[7]

Despite finding the manner in which Enos expressed her views to be "rude," "dismissive" and "condescending," Teixeira wrote, "I will look over some of your concerns and the info you provided and we can further discuss policy changes I might consider in the immediate future. He explained that he was trying to coach Enos to get her to be more respectful.

Unfortunately, Enos was not receptive. She became defensive and withdrawn. Again she refused to talk to him, this time for months. On one occasion when they did speak, Enos advised that she had spoken to an attorney. Teixeira asked her, "Why?" Enos told him it was because he makes her do "illegal" things. When he asked her, "Like what?" Enos said, "You don't want to know."

Teixeira continued to try and "coach" Enos. In her 2009 review, dated March 9, 2010, Teixeira acknowledged Enos "Particular strengths" and "Areas Improved." Among other things, he wrote that Enos was "Doing [a] great job with learning and doing more with billing, and with keeping track of finances/taxes," as well as, "Staying abreast on insurance changes, ..."

In "Areas to Continue to Improve," Teixeira suggested that Enos, "work on adopting a more positive 'can do' attitude," and, that she, "improve communication and interpersonal relationship with boss/coworker." He also noted that Enos was recently given 2 hours off per week with pay (pay rate adjusted) amounting to an additional 12 days off per year." See Joint Exhibit 66.

Notwithstanding Teixeira's effort, his working relationship with Enos remained strained and they continued to have conflict.[8] The evidence presented by Enos, replete

---

[7] Teixeira asked her to keep discs in the safe with the door closed but unlocked. Enos did not do as he asked. *See* Joint Exhibit 4, 8 and 9.

[8] Some, but not all examples include: Enos had issues with where Teixeira wanted her to park. She would bring nails and other debris from the back parking lot and leave them on his desk. She was indignant when an article of his clothing would end up in the laundry she did for the practice. She did not want him to dispose of the photocopier because it contained confidential data. She was concerned when he offered her long term disability coverage and made him put in writing that he would be liable if there were tax implications for her as the result. Even when Teixeira brought her corroborating information about

4

with her handwritten notes, clearly demonstrates that she had problems with how OSPT conducted business and that she had "lost respect" for Teixeira.[9] Neither the problems nor her feelings improved. *See* Exhibits 20 and 21.

Similarly, the evidence presented by OSPT, both written and anecdotal, clearly demonstrates that Teixeira had problems with how Enos communicated, her lack of respect and her insubordinate behavior. Neither the problems nor his impressions of Enos behavior towards him improved. *See* Exhibits 20 and 49.

Teixeira realized that he should terminate Enos for her rude behavior and insubordination, but he was afraid his small practice would have struggled without someone to perform the clerical work. While he thought Enos might quit because she was so unhappy, he believed he needed to find an appropriate replacement for her before letting her go. Unfortunately, Teixeira did not have time to find a replacement for Enos. Teixeira was working to complete his doctorate in physical therapy and his graduate studies took up most of his spare time until 2012.

After Teixeira finished his doctorate, he began to look for a candidate to replace Enos. He found a suitable replacement when an acquaintance agreed to take over the office manager position. Teixeira terminated Enos employment with OSPT on April 19, 2012.

Unbeknownst to OSPT and Teixeira, in March 2011, and again in January 2012, Enos reported OSPT to the oversight bodies for both MaineCare and Medicare. She had numerous communications with MaineCare, Medicare, and even the Governor's office about what she perceived to be fraud on the part of OSPT. She claimed that OSPT was intentionally overbilling the insurers and charging for more time than Teixeira actually spent treating patients.

MaineCare authorities conducted an audit of OSPT beginning in September 2011. OSPT complied with all document requests and a sight visit was conducted on October 6, 2011. During the course of the audit, the investigator sampled 100 patient files and

disposing of the photocopier and disability insurance, Enos was rude and did not believe him. Enos did not want OSPT to put her name on collection letters. She made comments when Teixeira arrived to work a few minutes late. After March 2010, Enos did not receive another formal review. She also did not receive another raise. Teixeira felt Enos had given up and that she was not receptive to any of his comments.

[9] *See* Enos 2009 notes, Exhibits 5-9 and 11-13; her 2010 notes, Exhibits 14 and 15; 2011 notes, Exhibits 18, 19, 22 and 25; and, her 2012 notes, Exhibits 38, 44 and 45.

examined OSPT's computer system. No evidence of fraud was detected but the investigator did find that some of OSPT's documentation was lacking. Specifically, notations of the actual time spent with patients and the potential for rehabilitation were either not included or provided insufficient information. In addition, it was determined that OSPT had billed more than the acquisition cost for certain supplies.

The audit was concluded and OSPT was issued a notice of violation on October 13, 2011. OSPT requested an informal review of the audit, which was completed on May 1, 2012. On or about June 7, 2013, OSPT received the final recoupment amount that it was required to pay – less than $2,000 for the documentation issues and less than $200 for billing more than the acquisition cost of medical supplies. OSPT made arrangements to pay the recoupment.[10]

While the audit was pending and prior to her termination, Enos reported to the MaineCare and Medicare authorities that Teixeira told her that they would have to be careful to record the patient "in and out" times to insure compliance going forward. Enos interpreted Teixeira's comment to mean he wanted *her* to go in and change existing records. Teixeira denied Enos interpretation of his comment. He explained that he raised the issue so Enos would remind him to document "in and out" times in the future. He also pointed out that at the time Enos made this particular accusation MaineCare had already selected the patient record samples for review. Changing or adding "in and out" times would have had no impact on the outcome of the audit. In addition, Teixeira reiterated that Enos never provided patient treatment; she never prepared treatment notes; she did not determine any patient's diagnosis or billing codes; and, Enos never recorded "in and out" time spent with patients.

OSPT and Teixeira did not learn that Enos had reported or complained about OSPT to MaineCare or Medicare until well after her employment was terminated. OSPT and Teixeira had no idea that Enos had ongoing communications with MaineCare and Medicare throughout the audit process. OSPT and Teixeira did not know that Enos continued her communications with them even after her employment was terminated on April 19, 2012, more than seven months after the MaineCare notice of violation issued.[11]

---

[10] *See* Joint Exhibits 26 - 28, 31- 33, 35 -36, 55, and 57 - 58 and 60.
[11] *See* Joint Exhibits 21, 24 -25, 34, 37, 39, 40 -43, 50, 53, and 62.

OSPT claims Enos' employment was terminated due to her long history of inappropriate and disrespectful workplace conduct; and, despite numerous warnings and efforts to coach Enos to be more professional and respectful in the workplace, she simply showed no signs of improvement. Enos claims OSPT's justifications for her termination are pretextual. She claims she was terminated because she refused to comply with Teixeira's "illegal" requests; and, because she reported what she perceived to be, or what actually were, illegal activities on the part of OSPT.

Enos filed a complaint with the Maine Human Rights Commission ("MHRC") claiming discrimination based on retaliation. On November 13, 2013, the MHRC issued Enos a right to sue letter.


DISCUSSION AND CONCLUSIONS

The Maine Whistleblower's Protection Act ("WPA"), 26 M.R.S. §§ 831, 833(1)(A), and the Maine Human Rights Act ("MHRA") 5 M.R.S. § 4551, *et seq.*, prohibit the discharge of an employee "because … [t]he employee, acting in good faith, … reports … to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted by the laws of this State … or the United States." The WPA also prohibits the discharge of an employee who, in good faith, refuses "to engage in activity that would be a violation of a law or rule adopted under the laws of this State … or the United States." 26 M.R.S. § 833(1)(D). "There are three elements to a claim of unlawful retaliation: (1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Caruso v. Jackson Lab.*, 2014 ME 101, ¶11, 98 A.3d 221.

In cases such as this, the court must "apply a three-step burden-shifting analysis to determine whether (1) the employee has presented prima facie evidence of discrimination; (2) the employer has presented prima facie evidence of a legitimate non-discriminatory reason for the adverse action; and, in response, (3) the employee has presented prima facie evidence that the employer's proffered reason is pretextual or untrue." *Fuhrmann v. Staples the Office Superstore E., Inc.*, 2012 ME 135, ¶¶13 & 14, 58

7

A.3d 1083.[12] This analytical framework addresses the parties' burdens of production, but not the burden of persuasion. *Id.* ¶ 13. At all steps, the plaintiff retains the ultimate burden of persuasion on the question of whether unlawful discrimination occurred. *DiCentes v. Michaud,* 1998 ME 227, ¶ 16, 719 A.2d 509. The court addresses each step in turn.

## I.     Enos' prima facie evidence of unlawful retaliation

As discussed above, in order to satisfy her burden on the first step, Enos must produce prima facie evidence of each element of her WPA claim: "(1) the employee engaged in activity protected by the statute; (2) the employee was the subject of an adverse employment action; and (3) there was a causal link between the protected activity and the adverse employment action." *Caruso,* 2014 ME 101, ¶11, 98 A.3d 221. The court may not enter judgment against an employee at this stage merely on the grounds that the plaintiff failed to satisfy her burden of persuasion because of an absence of direct evidence of unlawful discrimination. *Human Rights Comm'n v. City of Auburn,* 408 A.2d 1253, 1262 (Me. 1979). If the employee produces evidence sufficient to support an inference of unlawful discrimination, then the employee has met her burden of establishing a prima facie case of unlawful discrimination. *Id.*

Here, Enos' actions were clearly protected by the WPA, which prohibits the discharge of an employee who, in good faith, reports to an authority or the employer what the employee has reasonable cause to believe is a violation of the law or refuses to engage in activity the employee reasonably believes is a violation of the law. 26 M.R.S. § 833(1)(A),(D). Through the one-day course and her work at OSPT, Enos was knowledgeable about Medicare and MaineCare rules. Thus, Enos had reasonable cause to believe OSPT violated the law. Enos reported her concerns about OSPT's practices to Teixeira. Enos also reported OSPT to the oversight bodies for both MaineCare and Medicare and had numerous communications with MaineCare, Medicare, and the

---

[12] The Law Court recently held that the three-step, burden-shifting analysis was unnecessary in WPA retaliation cases on summary judgment and that it would no longer apply the burden-shifting analysis to WPA cases on summary judgment. *Brady v. Cumberland County,* 2015 ME 143, ¶ 39, _ A.3d _. The Law Court expressly stated that *Brady* did not present the Court with an opportunity to address whether the burden-shifting analysis remains a useful analytical tool for trial. *Id.* ¶ 39 n.9. Therefore, under prior precedent, the burden-shifting analysis continues to apply in this case.

8

Governor's office about what she perceived to be fraud by OSPT. MaineCare found no evidence of fraud, but ultimately did issue OSPT a notice of violation. Enos was also undisputedly subject to an adverse employment action when her employment was terminated.

However, Enos has failed to present sufficient prima facie evidence of a causal link between her reporting of OSPT to MaineCare and Medicare and her discharge. "To demonstrate a causal link, the plaintiff must show that the protected activity (whistleblowing) was a substantial, even though perhaps not the only, factor motivating the employee's dismissal." _Caruso_, 2014 ME 101, ¶ 13, 98 A.3d 221 (internal quotation marks and citation omitted). Temporal proximity of the adverse employment action to the employee's protected activity is circumstantial evidence that can give rise to an inference of a causal connection sufficient to establish causation for the prima facie stage of the analysis. _LePage v. Bath Iron Works Corp._, 2006 ME 130, ¶ 19, 909 A.2d 629. However, in order to infer a causal connection, there must be evidence that the employer was aware of the employee's protected activity. _Daniels v. Narraguagus Bay Health Care Facility_, 2012 ME 80, ¶ 21, 45 A.3d 722; _see also Fuhrmann_, 2012 ME 135, ¶ 16, 58 A.3d 1083.

Here, OSPT and Teixeira were not aware that Enos had reported OSPT to MaineCare or Medicare until well after her termination. OSPT and Teixeira were also unaware that Enos had communicated with MaineCare, Medicare, and the Governor's office. Because OSPT and Teixeira were not aware of Enos' reports to MaineCare or Medicare or her communications at the time of her termination, the court cannot infer that Enos' reporting of OSPT was substantial factor in her termination or the existence of causal connection. Therefore, Enos has failed to establish a prima facie case of unlawful retaliation for reporting OSPT to MaineCare and Medicare under the WPA.[13]

Enos has produced enough circumstantial evidence to at least raise an inference of a causal connection between her reporting of her concerns to Teixeira and her refusal to engage in what she believed to be illegal conduct and her termination. As previously

---

[13] Even if the court were infer a causal link between Enos' reporting of OSPT to MaineCare and Medicare and her termination and find that Enos has established a prima facie case, Enos' WPA claim of unlawful retaliation for reporting OSPT to MaineCare and Medicare would still fail to meet her burden of persuasion on the final step of the burden-shifting analysis as discussed below.

9

discussed, the evidence produced by Enos at this first step need not be persuasive in order to meet her burden. _Human Rights Comm'n_, 408 A.2d at 1262. The evidence need only support an inference of a causal connection. _Id._ A lack of temporal proximity between the protected activity and the adverse employment may not meet the burden of persuasion, but a lack of temporal proximity does not defeat the inference of a causal connection at the first step of the burden-shifting analysis. _Brady_, 2015 ME 143, ¶ 23, __ A.3d __.

In August 2009, following her attendance at a course on physical therapy coding and billing, Enos provided Teixeira with a written summary of certain practices at OSPT that Enos believed violated Medicare and MaineCare rules and regulations. On another occasion, Enos told Teixeira that she spoke with an attorney because Teixeira made her do "illegal" things. Further, during MaineCare's audit of OSPT in 2011, Enos believed the Teixeira had impliedly asked her to alter the "in and out" times logged in patient records. Enos' employment was terminated following these incidents on April 19, 2012. Despite a lack of temporal proximity, Enos has produced a minimally sufficient basis for the court to infer a causal connection between Enos' reporting of her concerns about OSPT's practices to Teixeira and her refusal to engage in illegal activity and her termination. _See Brady_, 2015 ME 143, ¶¶ 23-24, __ A.3d __. Therefore, Enos has met her burden of producing evidence of a prima facie case of retaliation for reporting violations of the law to OSPT and refusing to engage in illegal conduct.

II.    OSPT's legitimate, non-discriminatory reasons for Enos' termination

Regarding the second step of the burden-shifting analysis, OSPT presented both written and anecdotal evidence that Teixeira had problems with how Enos communicated, her lack of respect, and her insubordinate behavior. Therefore, OSPT has produced sufficient evidence of legitimate, non-retaliatory reasons for Enos' termination.

III.    Enos' evidence that OSPT's proffered reasons are pretextual or untrue

Enos' WPA claims fail the final step of the burden-shifting analysis. After the employer proffers evidence of legitimate, non-discriminatory reasons for the adverse employment action, the employee must "persuade the factfinder that there was, in fact, a causal connection between the protected activity and the adverse employment

10

action." *DiCentes*, 1998 ME 227, ¶ 16, 719 A.2d 509. To meet this burden, the employee must produce persuasive evidence that employer's proffered reasons are a pretext or persuade the factfinder that the inference of discrimination arising from the employee's prima facie case is so strong that employer's proffered reasons must be untrue. *Human Rights Comm'n*, 408 A.2d at 1262.

For the following reasons, Enos' has failed to persuade the court that OSPT's reasons for her termination are untrue. Foremost, OSPT and Teixeira were unaware of Enos' reports to MaineCare and Medicare and her ongoing communication with both. Second, there is a significant gap in time between Enos' delivery of her written summary of the OSPT practices she believed to be illegal to Teixeira in August 2009 and her termination in April 2012. This gap in time diminishes the persuasiveness of Plaintiff's evidence of retaliation. Third, the court finds Enos' advisement to Teixeira that she consulted an attorney because Teixeira made her do "illegal" is insufficient to prove her claim of retaliation for reporting illegal activity. When Teixeira asked Enos to explain what illegal activity she was referring to, Enos said, "You don't want to know." Enos' lack of explanation for her accusation makes this evidence less persuasive and fails to over come the OSPT's evidence of legitimate, non-discriminatory reasons for her termination. Lastly, in light of Teixeira's explanation, the court is not persuaded that Teixeira's statement that they would have to be careful to record the patient "in and out" times to ensure compliance going forward was a request for Enos to alter the patient records. Also, Enos failed to present persuasive evidence that she actually refused to engage in Teixeira's alleged illegal request. Thus, Enos has not produced sufficient evidence to persuade the court that she was terminated for reporting what she believed was illegal activity to her employer and refusing to engage in illegal activity. Therefore, Enos' evidence in support of her WPA retaliation claims case is not strong enough to persuade the court that OSPT's reasons for her termination are untrue.

Furthermore, none of the evidence proffered by Enos' persuades the court that OSPT's non-discriminatory reasons are a pretext. Enos' evidence fails to contradict OSPT's evidence, which clearly demonstrates that Teixeira had problems with Enos' communication, lack of respect, and insubordinate behavior, and that neither those problems nor Enos behavior improved prior to her termination. The court found Teixeira's testimony to be credible that he had decided to terminate Enos prior to the MaineCare audit but was concerned the practice would suffer without someone to

11

perform clerical work; and, he did not have time to search for Enos' replacement until completing his doctorate in 2012.

Furthermore, evidence in the record shows that Teixeira considered Enos' concerns about OSPT's practices and attempted to address them. Following Enos' delivery of her written summary on August 18, 2009, Teixeira spoke with other physical therapist about OSPT's practices. Teixeira also prepared a written response to Enos's concerns, in which he reminded Enos that he had brought these concerns to her in the past. Teixeira also stated that, while he disfavored Enos' approach, he appreciated and valued her input. Teixeira stated that he would look over some of Enos' concerns and the information she provided and discuss possible policy changes with her in the future. This evidence, which shows Teixeira acknowledged Enos' concerns and attempted to address them, weighs against Enos' claims that OSPT's reasons for her termination were a pretext for retaliation. On balance, Enos' has failed to meet her ultimate burden of persuading the court that OSPT's legitimate non-discriminatory reasons for terminating her employment are untrue or a pretext.

Based on the foregoing, the court finds that plaintiff Janet Enos has failed to prove her claim for unlawful retaliation under the Maine Whistleblower's Protection Act.

Judgment is entered in favor defendant Orthopedic & Spine Physical Therapy of L/A, Inc.

The Clerk is directed to enter this Order on the civil docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

Date: 11/20/15

Mary Gay Kennedy
Justice, Superior Court

12

JANET ENOS - PLAINTIFF

Attorney for: JANET ENOS
STEPHEN WADE - RETAINED 12/18/2014
SKELTON TAINTOR & ABBOTT
95 MAIN STREET
AUBURN ME 04210

vs

ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA - DEFENDANT

Attorney for: ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
ANNE TORREGROSSA - RETAINED 01/16/2014
BRANN ISAACSON
184 MAIN STREET
PO BOX 3070
LEWISTON ME 04243-3070

SHAN TEIXERIA - DEFENDANT

Attorney for: SHAN TEIXERIA
ANNE TORREGROSSA - RETAINED 01/16/2014
BRANN ISAACSON
184 MAIN STREET
PO BOX 3070
LEWISTON ME 04243-3070

SUPERIOR COURT
ANDROSCOGGIN, ss.
Docket No        AUBSC-CV-2013-00176

DOCKET RECORD

Filing Document:      COMPLAINT            Minor Case Type:   OTHER STATUTORY ACTIONS
Filing Date:          12/30/2013

Docket Events:

12/30/2013     FILING DOCUMENT - COMPLAINT FILED  ON 12/30/2013

12/30/2013     Party(s):   JANET ENOS
               ATTORNEY - RETAINED ENTERED   ON 12/30/2013

01/03/2014     Party(s):   ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
               SUMMONS/SERVICE - CIVIL SUMMONS SERVED  ON 12/27/2013
               SHAN TEIXEIRA OBO ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA INC

01/03/2014     Party(s):   ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
               SUMMONS/SERVICE - CIVIL SUMMONS FILED  ON 01/03/2014

01/03/2014     Party(s):   SHAN TEIXERIA
               SUMMONS/SERVICE - CIVIL SUMMONS SERVED  ON 12/27/2013
               SHAN TEIXEIRA

01/03/2014     Party(s):   SHAN TEIXERIA
               SUMMONS/SERVICE - CIVIL SUMMONS FILED  ON 01/03/2014

01/16/2014     Party(s):   SHAN TEIXERIA
               MOTION - MOTION TO DISMISS FILED  ON 01/16/2014
               WITH MEMORANDUM OF LAW, DRAFT ORDER, NOTICE OF HEARING

01/16/2014     Party(s):   ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA

STATE OF MAINE
ANDROSCOGGIN, ss.

JANET ENOS,

    Plaintiff

v.

ORTHOPEDIC & SPINE PHYSICAL
THERAPY OF L/A, INC., and SHAN
TEIXEIRA,
    Defendants

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-13-176
MGK-AND-11-18-14

ORDER

Before the court is Defendant Shan Teixeira's Motion to Dismiss Plaintiff Janet Enos's Complaint against him pursuant to Rule 12(b)(6). Enos's Complaint is for declaratory and injunctive relief as well as monetary damages pursuant to the Maine Human Rights Act, 5 M.R.S.A. § 4551 *et seq.* This court held a hearing on Teixeira's Motion, and has reviewed each party's filings regarding the Motion.

## I.    Factual Background

The following facts are gathered from the Complaint. Defendant Orthopedic & Spine Physical Therapy of LA, Inc. ("Orthopedic & Spine") is a Maine Corporation located in Lewiston. Teixeira is the owner and sole professional provider at Orthopedic & Spine. From approximately February 2007 to April 19, 2012, Enos was employed by Orthopedic & Spine as a receptionist and office manager. Teixeira supervised Enos directly and completed all of her annual reviews and evaluations. Enos received excellent annual reviews.

1

In August of 2009, Enos took a continuing education course on physical therapy coding and billing. She completed the class on August 14, 2009, and on August 18, 2009 Enos brought possible billing errors, including potentially fraudulent billings, to Teixeira's attention.

Teixeira informed Enos that instituting or requiring new policies was not a part of her role, but that he would take her concerns under consideration. Enos also raised concerns to Teixeira regarding his treatment notes, the inadequacy of treatment notes to justify MaineCare and Medicare billings, and possible overbilling. Teixeira defended his notes, and when Enos stated she did not want to be a party to potentially fraudulent billings, Teixeira allegedly responded along the lines of if Enos was not actually performing the billing then she was not committing fraud.

While Enos continued to do the in-house billing, she would raise concerns with Teixeira, who responded by yelling and defending his practices, and telling Enos all she needed to do was enter and bill. Enos eventually ceased to question Teixeira.

Insurance companies would sometimes ask for additional notes and support for treatments billed by the Defendants. Teixeira sometimes asked that Enos enter additional notes into bills that insurance companies questioned, and the Defendants asked that she make changes to files or notes, but Enos refused. The Defendants also failed to change their billing practices.

Enos subsequently reported the Defendants to Medicare and MaineCare authorities. After a MaineCare audit began around late 2011 or early 2012, Teixeira repeatedly asked Enos to make changes to records, notes and time entries, which Enos once again declined to do. In 2011, Medicare also requested and reviewed files. The requests from the Defendants continued (and were denied by Enos) after MaineCare issued a recoupment payment letter based upon unclear

2

billing and inadequate notes and the Defendants appealed the letter. The Defendants paid on MaineCare's final recoupment request.

The relationship between the Defendants and Enos worsened and Teixeira began to look for a candidate to replace Enos. She was eventually fired on April 19, 2012. Teixeira attributed Enos's firing to the fact that they were not getting along and, Enos's refusal to cooperate with some of his past requests. Enos stated that she felt Teixeira's requests were illegal and she requested a separation letter. The separation letter did not state why Enos was fired. Enos claims the Defendants justifications for her termination were pretextual, and asserts she was fired for complaining about what she perceived to be, or what actually were, illegal activities on the part of the Defendants.

Enos filed a complaint with the Maine Human Rights Commission ("MHRC") claiming discrimination based on retaliation. On November 13, 2013, after investigating the Plaintiff's complaints, the MHRC dismissed the action and issued a right to sue letter.

## II. Discussion

When considering a motion to dismiss under Rule 12(b)(6) the Law Court has held that:

'[w]e view the material allegation of the complaint as admitted and examine the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory. A dismissal is appropriate only when it appears beyond doubt that a plaintiff is entitled to no relief under any set of facts that he might prove in support of his claim. The legal sufficiency of a complaint is a question of law.'

*Thompson v. Dep't of Inland Fisheries & Wildlife*, 2002 ME 78, ¶ 4, 796 A.2d 674 (quoting *New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 3, 728 A.2d 673).

3

The complaint is intended to give the defendant notice of the claims that the opposing party will bring. Claims for relief must "contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief which the pleader seeks." M.R. Civ. P. 8(a). The rules require that "[e]ach averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required." M.R. Civ. P. 8(e)(1). The Law Court explained that "[t]he conception underlying Rule 8 M.R.C.P. is that the function of the complaint is to give fair notice of the claim, and this may be '. . . sufficiently performed by a rather generalized statement.'" *Casco Bank & Trust Co. v. Rush*, 348 A.2d 239, 241 (Me. 1975) (quoting 1 F.McK.& W., Me.Civ.Pr.2d, pp. 192, 193).)

The Supreme Court has held, however, that a complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

While Enos's Complaint fails to state the section or sections of the Maine Human Rights Act ("MHRA") that form the basis for her Complaint, on its face Enos's claim appears to be for unlawful employment discrimination based upon Whistleblowers' Protection Act ("WPA") protected activity. Such a claim falls under unlawful employment discrimination as defined in 5 M.R.S.A.§4572(1)(A) of the MHRA. The MHRA provides that an employer cannot discriminate based upon activity protected under the WPA, and states that:

> It is unlawful employment discrimination, in violation of this Act, except when based on a bona fide occupational qualification:

4

A. For any employer to fail or refuse to hire or otherwise discriminate against any applicant for employment because of race or color, sex, sexual orientation, physical or mental disability, religion, age, ancestry or national origin, . . . or because of previous actions taken by the applicant that are protected under [the Whistleblowers' Protection Act]; or, because of those reasons, to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment . . . .

§ 4572(1).

The WPA provides in pertinent part:

No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

. . .

D. The employee acting in good faith has refused to carry out a directive to engage in activity that would be a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States or that would expose the employee or any individual to a condition that would result in serious injury or death, after having sought and been unable to obtain a correction of the illegal activity or dangerous condition from the employer . . . .

26 M.R.S.A. § 833.

Teixeira has moved to dismiss Enos's complaint against him, because he asserts that he cannot be held individually liable for discrimination under the MHRA or WPA. Enos in her Opposition to Teixeira's Motion acknowledges that pursuant to *Fuhrmann v. Staples Office Superstore E., Inc.* Teixeira is not liable under the MHRA as an employer, but Enos argues that Teixeira may be liable under the MHRA for aiding and abetting or interference. 2012 ME 135, 58 A.3d 1083.

5

In *Fuhrmann*, the Law Court exhaustively analyzed the language in the WPA and MHRA, considered federal case law and found it not dispositive, and examined the legislative history of the MHRA and determined that "the Legislature has had opportunities (1) to expressly incorporate supervisor liability, and (2) to expressly eliminate supervisor liability from the MHRA. It has declined to do either, leaving us to interpret the original language of the statute." 2012 ME 135, ¶ 28, 58 A.3d 1083. The Law Court explained, "The MHRA provides that employment discrimination is committed by one who is an 'employer.'" *Id.* ¶ 24. The court analyzed the definitions of the term "employer", noting that it includes "'any person acting in the interest of any employer, directly or indirectly.'" *Id.* ¶ 24 (quoting 5 M.R.S. § 4553(4) (2011)). Next, the court looked to the definition of the word "person" under the MHRA, and noted that in the definition of the word "person" the word "supervisor" is never used. *Id.* ¶ 24. The court held that "[t]he MHRA's express incorporation of vicarious liability and its employer-specific remedies do not signal any intent to hold individual supervisors liable for employment discrimination." *Id.* ¶ 33. The Law Court ultimately determined that contrary to the interpretation of the MHRC, "[p]ursuant to either [the MHRA or the WPA] statutory definition of 'employer,' there is no individual supervisor liability for employment discrimination." *Id.* ¶ 35.

While nowhere in Enos's Complaint does she specifically mention aiding, abetting, or interference, Enos now employs those claims against Teixeira in what appears to be an attempt to circumvent the *Fuhrmann* decision. The MHRA defines unlawful discrimination to include:

A. Unlawful employment discrimination as defined and limited by subchapter III;

B. Unlawful housing discrimination as defined and limited by subchapter IV;

C. Unlawful public accommodations discrimination as defined by subchapter V;

6

**D.** Aiding, abetting, inciting, compelling or coercing another to do any of such types of unlawful discrimination . . . .

5 M.R.S.A. § 4553(10). The MHRA also includes a claim for interference. Section § 4633(2) provides:

> It is unlawful for a person to coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of the rights granted or protected by this Act or because that individual has exercised or enjoyed, or has aided or encouraged another individual in the exercise or enjoyment of, those rights.

5 M.R.S.A. § 4633

It is unclear to this court, and Enos has provided no persuasive explanation, as to why Maine would allow individual supervisor liability for aiding and abetting discrimination or interference, when there is no individual supervisor liability for employment discrimination. This court bears in mind that after interpreting the statute, the Law Court came to the conclusion in *Fuhrmann* that "we will not undermine the purpose of these statutes by reading them to provide for individual supervisor liability." 2012 ME 135, ¶ 34, 58 A.3d 1083

The Plaintiff has cited to a New Jersey sexual harassment case, *Tarr v. Ciasulli*, 853 A.2d 921 (2004), where the New Jersey Supreme Court did not find aiding and abetting liability, but nevertheless set out a standard for aiding and abetting liability, which the Plaintiff presumes Maine would also follow. The New Jersey Supreme Court found, much like the Law Court, that under its anti-discrimination law an "individual supervisor is not defined as an 'employer' under the LAD." *Tarr*, 853 A.2d 921, 928. It added, however, "Nevertheless, it is unlawful '[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden [under the LAD],' and such conduct may result in personal

7

liability."[1] *Tarr*, 853 A.2d 921, 928 (quoting N.J.S.A. 10:5-12e)(alterations in the original). The New Jersey Supreme Court looked to the meaning of the terms, the words the terms aid and abet are surrounded by, the Federal Court's prediction that it would adopt the definitions of aiding and abetting consistent with the Restatement (Second) of Torts, and the Restatement on concert liability itself. *Id.* at 928-929.

The court stated that "in order to hold an employee liable as an aider or abettor, a plaintiff must show that '(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as a part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.'" *Id.* at 9292 (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir.1999) (quotation omitted)(alteration in the original). To determine whether an individual has provided "substantial assistance", the court looked to five factors listed in the comments to section 876 of the *Restatement*: "(1) the nature of the act encouraged, (2) the amount of assistance given by the supervisor, (3) whether the supervisor was present at the time of the asserted harassment, (4) the supervisor's relations to the others, and (5) the state of mind of the supervisor." *Tarr*, 853 A.2d 921, 929 (citing *Restatement (Second) of Torts*, § 876(b) comment d (1979); *Hurley*, 174 F.3d at 127 n. 27).

---

[1] The court notes that wording regarding aiding and abetting in the MHRA differs from the wording in the New Jersey Law Against Discrimination. The New Jersey provision specifies: that it is either an unlawful employment practice or an unlawful discrimination "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so.'" N.J.S.A. 10:5-12e. Whereas the Maine provision only provides that unlawful discrimination includes "[a]iding, abetting, inciting, compelling or coercing another to do any of such types of unlawful discrimination . . . ." 5 M.R.S.A. § 4553(10).

8

The Massachusetts Supreme Court defined liability for aiding and abetting differently in a case involving claims of racial discrimination. In *Lopez v. Commonwealth*, the Massachusetts Supreme Court provided that

> In order to prevail on an aiding and abetting claim under § 4(5), a plaintiff must show (1) that the defendant committed "a wholly individual and distinct wrong ... separate and distinct from the claim in main"; (2) "that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender"; and (3) that "the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under G.L. c. 151B."

978 N.E.2d 67, 82 (2012) (quoting *Harmon v. Malden Hosp.*, 19 Mass. Discrimination L. Rep. 157, 158 (1997)).

Even if Maine were to recognize an aiding and abetting claim against an individual supervisor, Enos has not alleged actions taken by Teixeira that constitute aiding or abetting in her Complaint. Considering Enos's allegations contend that Teixeira was the principal actor in terms of the discrimination, Enos has not alleged any "distinct wrong" committed by Teixeira, nor has Enos alleged any actions by Teixeira that involved aiding or abetting another to commit discrimination. *See id.* Similarly, Enos's Complaint does not allege how Teixeira interfered with the Plaintiff carrying out protected activities. Most importantly, Enos failed to mention aiding, abetting, or interference in her Complaint, and therefore failed to give even "fair notice of the claim[s]." *Rush*, 348 A.2d 239, 241 (Me. 1975).

This court finds that allowing these two claims to go forward against Teixeira would be contrary to the Law Court's intent in *Fuhrmann*. "'In construing statutes, we look to the overall purpose of the law of which the section at issue forms a part and strive to interpret the language to avoid results that are inconsistent, unreasonable, or inapposite in relation to the law's overall

9

purpose.'" *Furhmann*, 2012 ME 135, ¶ 34, 58 A.3d 1083 (quoting *Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 19, 845 A.2d 1178). As the Law Court has ruled out individual supervisor liability for employment discrimination, it would be illogical to allow Enos's claims against Teixeira, essentially unlawful employment discrimination claims as articulated in the Complaint, although now framed differently by Enos, to proceed.

Accordingly, the court **ORDERS** that Defendant Teixeira's Motion is **GRANTED**. Plaintiff's Complaint is dismissed as to Defendant Teixeira.

The clerk is directed to incorporate this Order into the docket by reference pursuant to Maine Rule of Civil Procedure 79(a).

Dated: 11/18/14

Mary Gay Kennedy
Justice, Superior Court

10

Attorney for: JANET ENOS
M\_  N FRENETTE  - RETAINED
Sh. ..rON TAINTOR & ABBOTT
95 MAIN STREET
AUBURN ME 04210

**DOCKET RECORD**

vs
ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA - DEFENDANT

Attorney for: ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
ANNE TORREGROSSA  - RETAINED 01/16/2014
BRANN  ISAACSON
184 MAIN STREET
PO BOX 3070
LEWISTON ME 04243-3070

SHAN TEIXERIA  - DEFENDANT

Attorney for: SHAN TEIXERIA
ANNE TORREGROSSA  - RETAINED 01/16/2014
BRANN  ISAACSON
184 MAIN STREET
PO BOX 3070
LEWISTON ME 04243-3070

F\_ 'g Document: COMPLAINT                    Minor Case Type: OTHER STATUTORY ACTIONS
Fi\_ .ig Date: 12/30/2013

## Docket Events:

12/30/2013 FILING DOCUMENT - COMPLAINT FILED ON 12/30/2013

12/30/2013 Party(s):  JANET ENOS
          ATTORNEY - RETAINED ENTERED ON 12/30/2013
          Plaintiff's Attorney: MARC N FRENETTE

01/03/2014 Party(s):  ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 12/27/2013
          SHAN TEIXEIRA OBO ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA INC

01/03/2014 Party(s):  ORTHOPEDIC AND SPINE PHYSICAL THERAPY OF LA
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 01/03/2014

01/03/2014 Party(s):  SHAN TEIXERIA
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 12/27/2013
          SHAN TEIXEIRA

01/03/2014 Party(s):  SHAN TEIXERIA
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 01/03/2014

01/16/2014 Party(s):  SHAN TEIXERIA
          MOTION - MOTION TO DISMISS FILED ON 01/16/2014
          WITH MEMORANDUM OF LAW, DRAFT ORDER, NOTICE OF HEARING